UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DAVID KAPLAN,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>GRIDPOINT, INC.,<br><br>　　　　　　Defendant. | CASE NO. C09-0468JLR<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I.　INTRODUCTION

This matter comes before the court on Defendant GridPoint, Inc.'s ("GridPoint") motion for summary judgment (Dkt. # 23). GridPoint moves the court for judgment as a matter of law that GridPoint neither breached Plaintiff David Kaplan's employment contract nor wrongfully withheld his wages. Having considered the motion, as well as all papers filed in support and opposition, and neither party having requested oral argument, the court DENIES the motion (Dkt. # 23).

ORDER- 1

## II. BACKGROUND

**A. Factual background**[1]

In 2006, David Kaplan founded V2Green in Seattle with Seth Pollack and Seth Bridges. (Declaration of David Kaplan ("Kaplan Decl.") (Dkt. # 27) ¶ 2.) The company focused on developing technology to allow electric cars to interface with a power grid. (*Id.*) Mr. Kaplan developed the core intellectual property and, along with his wife, supplied most of the capital required to launch the company. (*Id.*) Mr. Kaplan was chairman of the board and Chief Executive Officer ("CEO") until November 2007, when he promoted John Clark, an employee he had hired in the summer, to replace him. (*Id.* ¶ 3) Although Mr. Kaplan remained chairman of the board and took the position of Chief Technology Officer ("CTO"), he now reported to Mr. Clark regarding operational issues. (*Id.* ¶¶ 3-4.) It immediately became evident that Mr. Clark and Mr. Kaplan could not work well together. (*Id.* ¶¶ 4-10.)

The first conflict arose shortly after Mr. Clark's promotion in November 2007. (*Id.* ¶ 5.) While discussing a business issue, "Mr. Clark blew-up at [Mr. Kaplan] and went on a diatribe that lasted for almost an hour." (*Id.*) Over the following months, Mr. Clark continued to "bully" Mr. Kaplan, Mr. Pollack and other V2Green employees. (*Id.* ¶¶ 6-7.) By May 2008, Mr. Kaplan, Mr. Pollack, and Mr. Bridges decided to place Mr. Clark on a Performance Improvement Plan ("PIP"), the consequences of which could lead to Mr. Clark's termination. (*Id.*; Deposition of Seth Pollack ("Pollack Dep.") (Dkt. #

---

[1] On a motion for summary judgment, the court views the facts in the light most favorable to Mr. Kaplan as the non-moving party.

28-2 at 2-23)[2] at 25-27; Def. Ex. 1 (Dkt. # 24-4 at 3).) After issuing the PIP, Mr. Kaplan's and Mr. Clark's relationship deteriorated further. (Kaplan Decl. ¶¶ 8-9.)

Meanwhile, in January 2008, V2Green's and GridPoint's executives began talking about a possible acquisition. (*Id.* ¶ 8.) In April, Mr. Kaplan met with GridPoint's board of directors. (*Id.*) Following the meeting, Mr. Clark, who had not been present, told Mr. Kaplan that he had "screwed it up" just like Mr. Clark had predicted. (*Id.*) In July, Mr. Kaplan and Mr. Clark met with GridPoint's board of directors because GridPoint was now serious about acquiring V2Green. (*Id.* ¶ 9.) Mr. Kaplan allowed Mr. Clark to run the meeting as long as Mr. Kaplan could make concluding remarks, but Mr. Clark took all the time himself. (*Id.*) The following day, Mr. Kaplan informed Mr. Clark, and then Mr. Pollack and Mr. Bridges, that he would not accept any role at GridPoint requiring him to report to Mr. Clark. (*Id.* ¶ 10; Deposition of John Clark ("Clark Dep.") (Dkt. # 28-2) at 25-49) at 47-48; Pollack Dep. at 35; Deposition of Seth Bridges ("Bridges Dep.") (Dkt. # 28-3 at 2-10) at 27-28.)

As the acquisition moved forward, Mr. Kaplan set the large-scale terms of the negotiations on behalf of V2Green, which was set to become GridPoint's Electric Vehicle Management ("EVM") group in Seattle after the acquisition. (Kaplan Decl. ¶¶ 11-12.) Throughout the negotiation process, Mr. Kaplan repeatedly declared to GridPoint's executives that he would neither accept any position, nor would the acquisition go through, if he had to report to Mr. Clark. (Kaplan Decl. ¶ 11-17;

---

[2] When citing to the docket, the court references pages within a docket entry if that entry include multiple depositions, exhibits, etc.

Deposition of Karl Lewis ("Lewis Dep.") (Dkt. # 28-3 at 12-46) at 55, 57, 58, 70, 118.) Mr. Kaplan offered to serve as GridPoint's CTO, or to resign after assisting in the transition. (Kaplan Decl. ¶ 14.) Both options would have kept him from reporting to Mr. Clark. (*Id.*) Although GridPoint decided against employing Mr. Kaplan as CTO, it insisted that Mr. Kaplan continue on with EVM. (*Id.*; Lewis Dep. at 117.) GridPoint wanted Mr. Kaplan's name "out in front" of EVM and wanted to hold him accountable for the new business. (Kaplan Decl. ¶ 14.) Mr. Kaplan again reiterated that he would not go forward with any arrangement that required him to report to Mr. Clark. (*Id.* ¶ 15.) Karl Lewis, GridPoint's Chief Operating Officer ("COO"), suggested that EVM be split into two units with Mr. Kaplan running one and Mr. Clark running the other. (*Id.*) Mr. Kaplan feared that the friction between him and Mr. Clark would adversely impact EVM. (*Id.*) Mr. Lewis then proposed that Mr. Kaplan become the General Manager of EVM ("GM"), reporting to Mr. Lewis. (*Id.* ¶¶ 16-17; Lewis Dep. at 119.) Mr. Clark would temporarily report to Mr. Kaplan until GridPoint could reassign Mr. Clark to another position outside of EVM. (Kaplan Decl. ¶ 16; Lewis Dep. at 119.) Mr. Kaplan agreed. (Kaplan Decl. ¶¶ 16.)

Before the acquisition closed on September 19, 2008, Mr. Kaplan also negotiated employment agreements protecting the V2Green employees. (Kaplan Decl. ¶¶ 11-18; Clark Dep. at 59.) If GridPoint terminated a V2Green employee without cause, or if the employee resigned for good reason, the agreements provided the employee with a severance package consisting of a year's salary and stock compensation. (Def. Ex. 19 (Dkt. # 24-4 at 17-42) at 1.) The agreements also set initial positions and responsibilities

for the V2Green employees. (*Id.*) Although Mr. Kaplan's agreement reflected his position as GM, it did not have a provision protecting him from reporting to Mr. Clark. (*See generally id.*) Yet, unbeknownst to Mr. Kaplan, GridPoint was already contemplating replacing him with Mr. Clark. (Pl. Ex. 30 (Dkt. # 24-3 at 5).)

Immediately after the acquisition, events began to unfold that would ultimately lead to Mr. Kaplan's departure from GridPoint. Within the first few days, Mr. Lewis transferred Mr. Clark outside of EVM. (Kaplan Decl. ¶ 19; Lewis Dep. at 181; Clark Dep. at 121.) Although Mr. Kaplan expected that Mr. Lewis would eventually transfer Mr. Clark, the transfer happened so quickly that it caused tension in EVM and hindered Mr. Kaplan's ability to manage the team. (Kaplan Decl. ¶ 19.) By November, Mr. Pollack and Mr. Bridges voiced concerns to GridPoint's executives regarding Mr. Kaplan's management abilities in the GM role. (Bridges Dep. at 83; Bridges Dep. Ex. 17.) Instead of replacing Mr. Kaplan with Mr. Clark at that time, GridPoint decided to have Mr. Kaplan report to someone new, Michael Lach, GridPoint's new COO. (Kaplan Decl. ¶ 20; Deposition of Michael Lach ("Lach Dep.") (Dkt. # 28-4 at 2-13) at 120-121.)

The situation improved until January 2009 when Mr. Kaplan raised concerns to GridPoint's management regarding the Seattle team's compensation. (Pl. Ex. 39 (Dkt. # 24-3 at 10-11).) At that point, GridPoint' executives, having considered and decided against terminating Mr. Kaplan for cause, began discussing internally how they might transition control of the EVM group to Mr. Clark. (*See* Deposition of Karen Wirz ("Wirz Dep.") (Dkt. # 28-4 at 15-28); Wirz Dep. Ex. 45; Pl. Ex. 39.)

On February 23, Mr. Kaplan, Mr. Lach and Peter Corsell, GridPoint's president and CEO, met to discuss Mr. Kaplan's future. (Kaplan Decl. ¶ 21.) Mr. Lach and Mr. Corsell informed Mr. Kaplan that he was now going to report to Mr. Clark, with Mr. Clark running EVM. (*Id.*) Mr. Kaplan reminded them that during the acquisition he repeatedly insisted that he would not accept a role reporting to Mr. Clark. (*Id.*) Although Mr. Kaplan, Mr. Lach and Mr. Corsell discussed alternative roles for Mr. Kaplan, Mr. Lach felt there was no position for Mr. Kaplan at GridPoint and Mr. Corsell mentioned a separation package.[3] (*Id.* ¶ 22; Def. Ex. 27 (Dkt. # 24-4 at 69-70).) Mr. Kaplan and Mr. Lach met briefly the next day. (Kaplan Decl. ¶ 23.) Mr. Lach rejected Mr. Kaplan's proposals regarding any possible alternative role and explained that his only objective was to remove Mr. Kaplan from GM of EVM and to insert Mr. Clark in his place. (*Id.*) Although Mr. Kaplan felt "railroaded," Mr. Lach told him that the decision was out of his hands and directed him to Mr. Corsell. (*Id.*) While Mr. Kaplan was on a plane back to Seattle, Mr. Lach emailed the Seattle office about the change in management, specifying that Mr. Kaplan's "ongoing role within the organization remains under discussion." (Def. Ex. 29 (Dtk. # 24-4 at 72); *accord* Kaplan Decl. ¶¶ 23-24.) There were no further discussions between Mr. Kaplan and GridPoint concerning his future. (Kaplan Decl. ¶ 24.)

Following the February meeting, GridPoint's executives began discussing how Mr. Kaplan would be "removed" from GridPoint. (Pl. Ex. 55 (Dkt. # 24-3 at 16-17);

---

[3] GridPoint contends that Mr. Kaplan was placed into an OEM business development role as of the February meeting (Mot. at 16), but Mr. Kaplan denies this (Kaplan Decl. ¶ 21).

ORDER- 6

*accord* Lach. Dep. at 276-277; Lach Dep. Ex. 44 (entitled "Lewis 44"); Lewis Dep. at 264-266.) Meanwhile, Mr. Kaplan was finishing the transition of EVM to Mr. Clark and had no position within GridPoint after the transition. (Kaplan Decl. ¶ 27.) On March 2, Mr. Kaplan's lawyer sent a letter to Mr. Corsell stating that Mr. Kaplan had been terminated without cause, triggering the severance package in the employee agreement. (*Id.* ¶ 25.) Mr. Corsell called Mr. Kaplan that night, insisting that Mr. Kaplan had not been terminated. (*Id.* ¶ 26.) Mr. Corsell added that if Mr. Kaplan would reconsider his position that he had been terminated, Mr. Corsell was willing to negotiate a separation package. (*Id.*) Mr. Kaplan declined, finished his transition work on March 5, 2009, and declared that his employment had ended. (*Id.* ¶ 27.)

**B.     Procedural history**

Mr. Kaplan brought the instant lawsuit in King County Superior Court, and GridPoint removed it to federal court asserting this court's diversity jurisdiction. (Not. of Removal (Dkt. # 1).) Mr. Kaplan alleges that GridPoint breached his employment agreement by terminating him without cause and subsequently failing to pay his severance compensation. (Compl. (Dkt. #1 at 7-19) ¶¶ 5.1-5.3.) Mr. Kaplan also alleges two statutory claims for failure to pay wages under RCW 49.48.010 and RCW 49.52.050. (*Id.* ¶¶ 6.1-7.3.) GridPoint now moves for summary judgment on all of Mr. Kaplan's claims. (Mot. at 1-2.)

## III. ANALYSIS

### A. Legal standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. The non-moving party "must present affirmative evidence to make this showing." *Id*. Furthermore, as the Ninth Circuit teaches, "[b]ald assertions that genuine issues of material fact exist are insufficient," and a mere scintilla of evidence supporting a party's position is also inadequate. *Id*.

### B. Contract ambiguity

Mr. Kaplan's employment contract provided the following:

> (a) *Position and Duties*. As of the Effective Date, the Employee ***initially*** will serve as General Manager, Plug-in Electric Vehicle Group of the Company. The Employee shall render such business and professional services in the performance of his duties as General Manager, Plug-in Electric Vehicle Group, consistent with the Employee's position within the

| | |
|---|---|
| 1 | Company, as shall reasonably be assigned to him by the Chief Executive Officer or his designee. |
| 2 | |

(Def. Ex. 19 at 1 (emphasis added)). The parties agree that GridPoint was obligated to employ Mr. Kaplan as GM "initially." However, they did not define "initially" during their negotiations and now dispute how long the "initial" obligation lasted. (Resp. at 15; Reply at 3.)

In construing a written employment contract, "the basic principles require that (1) the intent of the parties controls; (2) the court ascertains the intent from reading the contract as a whole; and (3) a court will not read an ambiguity into a contract that is otherwise clear and unambiguous." *Dice v. City of Montesano*, 128 P.3d 1253, 1257 (Wash. Ct. App. 2006) (quoting *Mayer v. Pierce County Med. Bureau*, 909 P.2d 1323, 1326 (Wash. Ct. App. 1995)). "As a general rule, . . . the parties' intentions [are a] question[] of fact." *Wm. Dickson Co. v. Pierce County*, 116 P.3d 409, 413 (Wash. Ct. App. 2005). A court may interpret a contract as a matter of law, however, "when '(1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence.'" *Dice*, 128 P.3d at 1257 (quoting *Tanner Elec. Corp. v. Puget Sound Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996)). Courts "give words in a contract their ordinary, usual and popular meaning," *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005), but a written employment contract is ambiguous "if its terms are uncertain or they are subject to more than one meaning," *Dice*, 128 P.3d at 1257. The mere fact that parties suggest opposing meanings, however, does not render a contract ambiguous, *id.*, and

"[a]mbiguity will not be read into a contract where it can be reasonably avoided," *Mayer*, 909 P.2d at 1326 (quoting *McGary v. Westlake Investors*, 661 P.2d 971, 974 (1983)).

GridPoint contends that "initially" carries only its common English meaning—in the first place: at the beginning. (Reply at 3-4.) Once the acquisition went through, then, its obligation to "initially" employ Mr. Kaplan as GM was satisfied, and it could reassign him. (Mot. 20-21; Reply at 3-4.) Mr. Kaplan contends that "initially" is subject to more than one meaning. (Resp. at 15-16.) "Initially," Mr. Kaplan argues, could reasonably last until the EVM group was integrated with GridPoint. (*Id.*) Until then, he could not be reassigned unless he and GridPoint mutually agreed to it. (*Id.* at 15.) According to GridPoint, however, the surrounding negotiations only show that GridPoint retained the flexibility to reassign the V2Green employees as it saw fit. (Mot. at 20-21; Reply at 5-6.)

The court agrees with Mr. Kaplan that the term "initially" is at least ambiguous. Even giving "initially" its common English meaning, GridPoint has not clarified how long "initially" or "the beginning" lasted. The various employees' statements GridPoint presents tend to show that none of the employees knew what "initially" meant or how long it would last.[4] (*See* Mot. at 6, 21; *see also* Reply at 5.) Regardless, GridPoint insists that if the court were to disagree with its construction of "initially," the effect would be to rewrite the contract without the term at all. (Reply at 3-4.) Although it is true that

---

[4] GridPoint claims its employees knew their jobs would be subject to change because EVM would eventually be integrated with GridPoint. (Mot. at 21 (referencing Pollack Dep. at 81-82; Bridges Dep. at 54-55; Clark Dep. at 111)); (Reply at 5-6 (referencing Pollack Dep. at 82; Clark Dep. at 111; Lewis Dep. at 40; Def. Ex. 18 (Dkt. # 24-4 at 14))).) That the employees knew their jobs would *eventually* change, however, does not shed any light on the meaning of "*initially*" in this contract.

"[c]ourts can neither disregard contract language which the parties have employed nor revise the contract under a theory of construing it," *Wagner v. Wagner*, 621 P.2d 1279, 1283 (Wash. 2008), it is also true that "[w]here one construction would make a contract unreasonable, and another, equally consistent with its language, would make it reasonable, the later more rational construction must prevail," *Bryne v. Ackerlund*, 739 P.2d 1138, 1143 (Wash. 1987). Here, the parties agree that Mr. Kaplan was valuable to GridPoint and instrumental in negotiating the acquisition and the employment agreements. Given these facts, a trier of fact could find that GridPoint's construction is unreasonable, and that the contract afforded Mr. Kaplan protection beyond the moment GridPoint decided "initially" was satisfied. Thus, the meaning of "initially" cannot be decided on summary judgment.

## C. Breach of contract claim

The employment agreement provided that GridPoint would pay Mr. Kaplan severance if it terminated him without cause. (Def. Ex. 19 at 3). GridPoint has not paid the severance because it believes Mr. Kaplan voluntarily resigned. (Mot. at 16-17; Reply at 9-10.) Mr. Kaplan argues that he is due his severance because GridPoint terminated him without cause and breached the employment contract in two ways. (Resp. at 17-21.) First, GridPoint removed Mr. Kaplan as GM without his consent. (*Id.*) Second, GridPoint precipitated Mr. Kaplan's resignation by requiring him to report to Mr. Clark, which "terminated Mr. Kaplan's employment in everything but name." (*Id.* at 21-24.)

1. GridPoint's removal of Mr. Kaplan from the GM position

GridPoint contends that as of February 23, 2008, it reassigned Mr. Kaplan to a "business development role with the automotive OEMs reporting to Clark." (Mot. at 16.) Mr. Kaplan argues that GridPoint removed him as GM, but that it never reassigned him to another clear role. (Resp. at 18.) Regardless of how it happened, the parties agree that Mr. Kaplan was removed. If the trier of fact finds that the contract precluded GridPoint from removing Mr. Kaplan from the GM position during a certain time, the trier of fact could also find that GridPoint breached the contract when it did so.

2. GridPoint's reassignment of Mr. Kaplan to report to Mr. Clark

It is undisputed that when GridPoint removed Mr. Kaplan as GM, GridPoint planned to have Mr. Kaplan report to Mr. Clark, and that Mr. Kaplan refused and his employment with GridPoint ended. GridPoint argues that Mr. Kaplan voluntarily resigned whereas Mr. Kaplan argues that GridPoint precipitated his resignation.

"[A]n employer may discharge an employee by intentionally precipitating a resignation, though formally retaining the employee in an attempt to avoid liability for compensation under a severance pay plan." *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 700 P.2d 338, 342 (Wash. Ct. App. 1985). "A discharge may occur when the employer, by words or acts, indicates an intention to dispense with the employee's services." *Id.* "[A] change in an employee's duties to put them outside of those contemplated at the time of hiring may indicate an employer's intention to terminate the employee." *Id.* In contrast, "[a] voluntary resignation occurs when an employee

abandons the employment because of a desire to leave, including such a desire motivated by a dissatisfaction with working conditions." *Id.* at 343.

Here, a trier of fact could reasonably find that GridPoint precipitated Mr. Kaplan's resignation thereby discharging him. GridPoint argues that it never intended to terminate Mr. Kaplan for the following reasons: GridPoint could have terminated Plaintiff on numerous prior occasions, but it did not (Mot. at 18); GridPoint valued Mr. Kaplan and by placing him under Mr. Clark, it only wanted to mimic the "model that had made V2Green so successful" (*id.*); and GridPoint was not planning to terminate Mr. Kaplan at the time when he resigned (*id.* at 18 n.17; Reply at 11-12). Mr. Kaplan, however, presents evidence supporting the following: that, around the time his employment ended, GridPoint was discussing how it would terminate Mr. Kaplan (Pl. Ex. 55; Lach. Dep. at 276-277; Lach Dep. Ex. 44 (entitled "Lewis 44"); Lewis Dep. at 264-266); that GridPoint believed Mr. Kaplan would quit if he were forced to report to Mr. Clark (Lewis Dep. at 264-266; Pl. Ex. 34); that, after Mr. Kaplan's employment ended, GridPoint offered to negotiate a separation package if he retracted the statement that he had been terminated (Kaplan Decl. ¶ 22); and that GridPoint offered Mr. Kaplan no position *until* he claimed he had been terminated (*id.*; *see* Def. Ex. 29 (Dkt. # 24-4 at 72)). These facts present a genuine issue regarding whether GridPoint intended to terminate Mr. Kaplan.

Further, the employment agreement provided that Mr. Kaplan would render his "business and professional services in the performance of his duties as [GM] consistent within the Company, as shall reasonably be assigned to him by the [CEO]." (Def. Ex. 19 at 1.) As Mr. Kaplan correctly argues, because the GM duties were the only duties the

parties negotiated, a reasonable trier of fact could find that GridPoint reassigned duties to Mr. Kaplan outside those complicated at the time of hiring. (*See* Reply at 19.)

Courts also look to constructive discharge cases for guidance in determining whether, in a breach of contract case, a resignation is voluntary or precipitated. *Barrett*, 700 P.2d at 342 n.7. "To establish [a constructive discharge] claim, the employee must show (1) the employer deliberately made the working conditions intolerable for the employee, (2) a reasonable person would be forced to resign, (3) the employee resigned solely because of the intolerable conditions, and (4) the employee suffered damages." *Campbell v. State*, 118 P.3d 888, 894 (Wash. Ct. App. 2005). "The question of whether the working conditions were intolerable is one for the trier of fact, unless there is no competent evidence to establish a claim of constructive discharge." *Haubry v. Snow*, 31 P.3d 1186, 1192 (Wash. Ct. App. 2001).

Here, Mr. Kaplan's evidence reasonably supports the elements of constructive discharge, thereby tending to show that GridPoint may have precipitated Mr. Kaplan's resignation. It is undisputed that GridPoint deliberately reassigned Mr. Kaplan to a position where he would have to report to Mr. Clark, a condition Mr. Kaplan viewed as intolerable; that Mr. Kaplan resigned because of that condition; and that GridPoint has not paid Mr. Kaplan his severance package. Although GridPoint argues that "there was nothing 'oppressive' or 'intolerable' about having Plaintiff report to Clark" (Mot. at 22), the record indicates that Mr. Kaplan found it intolerable to work with Mr. Clark. Thus, it is for the trier of fact to decide whether a reasonable person would have been forced to resign in Mr. Kaplan's situation.

GridPoint also urges that Mr. Kaplan should have negotiated a clause that prevented GridPoint from reassigning him to Mr. Clark. (Mot. at 23.) However, if the trier of fact was to conclude that Mr. Kaplan's situation was intolerable, the court is aware of no authority that requires an employee to negotiate for protection against intolerable working conditions.

Lastly, GridPoint relies on *Barrett* for the proposition that before an employee can claim intolerable working conditions, he or she must work in the position for some set amount of time. In *Barrett*, the court refused to consider Ms. Barrett's conditions in her new position as unreasonably oppressive because she was in the new position for only three days. 700 P.2d at 343. Here, GridPoint argues that because Mr. Kaplan never even tried the OEM business development role, he cannot claim it was unreasonably oppressive. (Mot. at 21-22; Reply at 11.) In *Barrett*, however, Ms. Barrett did not know what the new position would entail, whereas here Mr. Kaplan knew exactly what to expect if he had to report to Mr. Clark. Thus, GridPoint's argument is unavailing.

For the foregoing reasons, viewing the facts in the light most favorable to Mr. Kaplan, the court denies GridPoint's summary judgment motion as to Mr. Kaplan's breach of contract claim.[5]

---

[5] GridPoint urges the court that it cannot possibly find that GridPoint terminated Mr. Kaplan without cause as a matter of law. (*E.g.*, Mot. at 17; Reply at 10.) GridPoint's fear is misplaced. A finding that there is a genuine issue for trial is not a conclusion that GridPoint terminated Mr. Kaplan without cause as a matter of law.

**D.  Wage claims**

The parties agree that Mr. Kaplan's second and third causes of action, his wage claims under RCW 49.48.010 and RCW 49.52.050, depend on his breach of contract claim. (Mot. at 23-24; Resp. at 24.)  Therefore, the court denies GridPoint's summary judgment motion as to the wage claims having already denied it as to the contract claim.[6]

## IV.  CONCLUSION

For the foregoing reasons, the court DENIES GridPoint's motion for summary judgment (Dkt. # 23).

Dated this 8th day of March, 2010.

_____
JAMES L. ROBART
United States District Judge

---

[6] Although GridPoint must have willfully withheld wages in order to be liable under RCW 49.52.050, a trier of fact could find that GridPoint willfully withheld Mr. Kaplan's wages if GridPoint intentionally precipitated his resignation.