The Honorable James L. Robart

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DAVID KAPLAN,<br><br>           Plaintiff,<br><br>v.<br><br>GRIDPOINT, INC.,<br><br>           Defendant. | Case No.: C09-0468 JLR<br><br>PLAINTIFF'S TRIAL BRIEF |

**Factual Summary**

This is a classic case of bait and switch. In 2008 defendant GridPoint, Inc., sought to acquire V2Green, a Seattle clean energy company that made connectivity technology to allow electric vehicles to interface with a power grid. Plaintiff David Kaplan had founded V2Green, and was majority shareholder and Chairman of the Board. Mr. Kaplan's future role in GridPoint was a critical issue during the lengthy negotiations between V2Green and GridPoint. GridPoint wanted Mr. Kaplan to report to V2Green's current Chief Executive Officer John Clark. Mr. Kaplan and Mr. Clark had developed an acrimonious relationship over the past year as a result of Mr. Clark's abusive behavior towards Mr. Kaplan and other V2Green personnel. Throughout the

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 1 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

summer of 2008, Mr. Kaplan made it a *sine qua non* of GridPoint's acquisition of V2Green that he would not report to Mr. Clark.

During a three-hour meeting on September 3, 2008, among Mr. Kaplan, GridPoint's President Peter Corsell and Chief Operating Officer ("COO") Karl Lewis, the Company agreed to Mr. Kaplan's condition that he not report to Mr. Clark. The meeting determined the only role within GridPoint acceptable to both Mr. Kaplan and the Company was that of General Manager of GridPoint's Seattle office a/k/a the Electric Vehicle Management Group ("EVM"). GridPoint and Mr. Kaplan signed a bilateral three-year Employment Agreement appointing Mr. Kaplan to that position in September 2008, and the acquisition went forward. Mr. Kaplan's Employment Agreement and his contemporaneously executed Stock Restriction Agreement provided that Mr. Kaplan would receive one year's salary and millions of dollars of GridPoint stock options if the Company terminated his employment without cause.

Mr. Kaplan did not know that GridPoint had offered him the position of head of EVM only to ensure that its acquisition of V2Green went forward, and was contemplating his removal from the position even before the deal had closed on September 19. Two months after the consummation of the acquisition, GridPoint attempted to replace Mr. Kaplan as head of EVM with Mr. Clark. When Mr. Kaplan refused to step down, Mr. Lewis, who was Mr. Kaplan's supervisor, informed Michael Lach, GridPoint's new COO, that directing Mr. Kaplan to report to Mr. Clark would likely result in Mr. Kaplan's departure from GridPoint. Mr. Lewis recognized that if Mr. Kaplan voluntarily resigned from the Company it would avoid its substantial financial obligations to him under his Employment and Stock Restriction Agreements. But Mr. Lewis noted that GridPoint could not at that time replace Mr. Kaplan's

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 2 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

contacts with General Motors. Therefore, in November 2008 GridPoint agreed to Mr. Kaplan's proposal that he remain as General Manager of EVM, but reporting to Mr. Lach instead of Mr. Lewis.

Just two months later, on January 27, 2009, Mr. Lach and Mr. Lewis renewed their discussion of "what collateral damage . . . might exist if we separated ways with [Mr. Kaplan] and put John Clark back running evm." That same day, Mr. Lach met with his assistant Karen Wirz to discuss putting together documentation "against" Mr. Kaplan to terminate his employment "with cause." GridPoint soon realized that it could not establish "cause" to dismiss Mr. Kaplan without triggering its substantial financial obligations to Mr. Kaplan under his Employment and Stock Restriction Agreements. The Company therefore undertook a different course of action.

GridPoint summoned Mr. Kaplan to a meeting with Mr. Corsell and Mr. Lach on February 23, 2009. They informed Mr. Kaplan that they would be removing him from his position as head of EVM and offered him only one option within the Company: reporting to Mr. Clark. Mr. Kaplan reminded Mr. Corsell and Mr. Lach that during the acquisition negotiations he had repeatedly stated that he would not accept a role within GridPoint reporting to Mr. Clark and reiterated that he would not work for Mr. Clark under any circumstances. Mr. Kaplan, Mr. Lach, and Mr. Corsell then began discussing whether there were any alternative positions for Mr. Kaplan within GridPoint. Mr. Lach said he did not see another role for Mr. Kaplan within GridPoint. Mr. Corsell proposed a separation package as another option. Mr. Kaplan's future status within GridPoint was not resolved at this meeting.

Following a 30-minute meeting the next day during which Mr. Lach shot down every alternative that Mr. Kaplan proposed, Mr. Lach transmitted an e-mail to the

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 3 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Seattle office informing them that Mr. Clark was taking over as head of EVM and that all of Mr. Kaplan's subordinates would now be reporting to Mr. Clark. Mr. Lach wrote that Mr. Kaplan's "ongoing role within the organization remains under discussion." There were, however, no further discussions between GridPoint and Mr. Kaplan over an ongoing role for him within the organization. Mr. Kaplan had left a voice mail for Mr. Corsell on February 24 to talk about where things stood, but Mr. Corsell never returned his call. That same day Mr. Lach wrote Mr. Corsell and Mr. Lewis: "We should move to negotiate an exit." The next day, Mr. Corsell contacted the GridPoint Board of Directors Compensation Committee about a severance package for Mr. Kaplan.

On February 26 Mr. Lach wrote Mr. Corsell and Mr. Clark the following:

> Peter, you mentioned he already had a call into you—I believe you are already in discussions with him re: a departure. That needs to be cared for asap. He will go slow so this needs to be pushed hard from your side. I would not have him in the office past whatever transition work is underway over the next week given the fact that he refused to work for John who is now running it. This is something you'll have to make clear to him as you work his exit. We can't allow this dysfunction to remain. Kaplan needs to be removed.

By March 2 the only option GridPoint was considering was a separation package for Mr. Kaplan. On March 2 undersigned counsel sent Mr. Corsell a letter stating that GridPoint had terminated Mr. Kaplan's employment "without cause" within the meaning of his Employment and Stock Restriction Agreements, thus triggering GridPoint's substantial financial obligations under those agreements. That night, Mr. Corsell called Mr. Kaplan at home. Mr. Corsell was very angry and verbally abusive. Mr. Corsell demanded Mr. Kaplan retract his claim he had been terminated. If Mr.

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 4 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Kaplan did, Mr. Corsell said he would be willing to negotiate a separation package for him. Mr. Kaplan declined.

Following the receipt of the letter from counsel asserting Mr. Kaplan had no position within GridPoint, Mr. Clark and Mr. Corsell began falsely claiming that on February 23 Mr. Kaplan had been formally appointed to the position of head of Original Equipment Manager ("OEM") business development, reporting to Mr. Clark. After February 24 Mr. Kaplan's only role within GridPoint was to ensure the smooth transition of management of the EVM group, a task he had volunteered to take on. Mr. Kaplan had no title or position. Once Mr. Kaplan finished his transition work on March 5, his employment with GridPoint came to an end.

Mr. Kaplan filed suit against GridPoint in King County Superior Court on March 16, 2009, asserting that GridPoint had breached his Employment Agreement by terminating his employment without cause. GridPoint removed the case to federal court on April 7, 2009. Because Mr. Kaplan's Stock Restriction Agreement contains a forum selection mandating that claims under that agreement be litigated in Delaware, Mr. Kaplan could not bring those claims in this court. The parties, however, have signed a written stipulation that a judgment in favor of Mr. Kaplan in this action will not preclude him, on the basis of claim splitting/claim preclusion, from bringing a subsequent action in Delaware for the breach of the Stock Restriction Agreement. Mr. Kaplan's claims under the Stock Restriction Agreement are potentially worth several million dollars.

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 5 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

**Legal Claims**

In this action Mr. Kaplan brings three legal claims related to his Employment Agreement: (1) breach of contract; (2) failure to pay wages due under RCW 49.48; and (3) willful withholding of wages under RCW 49.52.

*Contractual Claims.*

Mr. Kaplan alleges that GridPoint terminated his employment "without cause." A discharge from employment occurs when the employer indicates by words or acts an intention to dispense with the employee's services. *Barrett v. Weyerhaeuser Company Severance Pay Plan*, 40 Wn. App. 630, 636, 700 P.2d 338 (1985). In determining whether an employer has indicated an intention to discharge the employee, cases that apply the doctrine of constructive discharge provide useful guidance. *Id.* at n.7. If an employer removes the very job duties that at the time of hire the parties specifically contemplated the employee would perform, this manifests the employer's intent to terminate the employee. *Id.* at 637. Accord e.g., *Hondares v. TSS-Seedman's Stores, Inc.*, 543 N.Y.S.2d 442, 151 A.D.2d 411 (1989); *Kass v. Brown Boveri Corp.*, 199 N.J. Super. 42, 488 A.2d 242 (1985); *Sanders v. May Broadcasting Co.*, 214 Neb. 755, 336 N.W.2d 92 (1983); *Miller v. Winshall*, 9 Mass. App. Ct. 312, 400 N.E.2d 1306 (1980); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 280 N.E.2d 867 (1972); *Hayes v. Resource Control, Inc.*, 170 Conn. 102, 104, 365 A.2d 399 (1976); *McLaughlin v. Union-Leader Corp.*, 99 N.H. 492, 116 A.2d 489 (1955); *Mair v. Southern Minnesota Broadcasting Co.*, 226 Minn. 137, 140, 32 N.W.2d 177 (1948); *Marks v. Cowdin*, 226 N.Y. 138, 146-47, 123 N.E. 139 (1919). Modification of a bilateral contract requires both a meeting of the minds and new

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 6 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

consideration. *Duncan v. Alaska USA Fed. Credit Union, Inc.*, 148 Wn. App. 52, 74, 199 P.3d 991 (2008).

On February 24, 2009, GridPoint removed Mr. Kaplan from the position of General Manger of EVM, the only duties that he and GridPoint had agreed at the time of his hire that he would perform. Mr. Kaplan had a written employment contract that specified he would perform the duties of a particular position, an agreement that was reached only after a long and contentious negotiation about the role and responsibilities he would have at GridPoint. The Employment Agreement specified Mr. Kaplan's "*Position and Duties*" as follows:

> As of Effective Date, the Employee will initially serve as General Manager, Plug in Vehicle Group of the Company. The Employee shall render such business and professional services in the performance of his duties as General Manager, Plug-In Electric Vehicle Groups, consistent with Employee's position within the Company as shall be assigned to him by the Chief Executive Officer or his designee.[1]

Mr. Kaplan's Employment Agreement was a contract for the specific position of General Manager of EVM. *Barrett* and the non-Washington authorities cited above establish a rule that when an executive is hired for a particular position, a material change in duties or removal from the position amounts to an effective discharge and a breach of the employment agreement even where the employee has experienced no reduction in salary. *See, e.g., Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 280 N.E.2d 867 (1972); *Miller v. Winshal*, 9 Mass. App. Ct. at 317-18. *Walker v. City of Cookeville*, 2003 WL 21918625 (Tenn. Ct. App. 2003).

GridPoint argues that the contract's use of the word "initially" in the first sentence of paragraph 1(a) gave it the unilateral right to remove Mr. Kaplan from his

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 7 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

position as General Manager of EVM and reassign him to whatever position it saw fit. GridPoint's interpretation of Mr. Kaplan's Employment Agreement is patently unreasonable. In determining the parties' contractual intent, the court must examine (1) the contract as a whole; (2) the subject matter and objective of the contract; (3) all the circumstances surrounding the making of the contract; (4) the subsequent acts and conduct of the parties to the contract; and (5) the reasonableness of the respective interpretations advocated by the parties. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996); *Paradise Orchards*, 122 Wn. App. at 516; *Martinez v. Miller Industries, Inc.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999). Application of these factors demonstrates that the far more reasonable reading of Mr. Kaplan's Employment Agreement is that it was a contract for Mr. Kaplan's employment in the specific position of EVM General Manager, and that Mr. Kaplan could be reassigned to another position only upon mutual agreement.

There were no discussions between the parties during the negotiation of the Employment Agreement as to the meaning of the word "initially" but the circumstances of GridPoint's acquisition of V2Green and creation of the EVM Group provide informative context as to why to the parties agreed to its inclusion. The Employment Agreements of the four V2Green principals (Messrs. Kaplan, Clark, Pollack, and Bridges) all had three-year terms. The parties understood that the EVM Group would be integrated within GridPoint's larger structure in less than three years. The position of General Manager of EVM (and the roles of the other V2Green principles) would likely cease to exist following the full integration of V2Green into

---

[1] Although Mr. Kaplan's Employment Agreement refers to the "Plug-In Electric Group," the name of the Seattle office had already been changed to EVM by the time the acquisition had closed.

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 8 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

GridPoint's operations. It therefore made sense for Mr. Kaplan's Employment Agreement to specify he would "initially" have the position of General Manager of the EVM Group. The issue is not whether Mr. Kaplan's Employment Agreement contemplated that his role might change, but whether the contract gave GridPoint the unilateral authority to alter the basic nature of his employment over his objections. The Court should hold that it did not and that GridPoint terminated Mr. Kaplan's employment without cause by unilaterally removing him from the position of General Manager of EVM.

GridPoint not only removed Mr. Kaplan from his position of General Manager of EVM in February 2009, it offered him a position reporting to his replacement, Mr. Clark, as his only option for remaining with the Company. During the negotiations between Mr. Kaplan and GridPoint in August-September 2008, Mr. Kaplan repeatedly told Mr. Corsell and Mr. Lewis (as well as the other V2Green principles) that reporting to Mr. Clark was a deal-breaker for him. GridPoint's acquisition of V2Green would never have occurred if GridPoint had not agreed to Mr. Kaplan's condition that he not report to Mr. Clark. GridPoint understood ordering Mr. Kaplan to report to Mr. Clark would be intolerable to Mr. Kaplan, and if given a choice between that and leaving GridPoint, Mr. Kaplan would in all likelihood choose the latter. GridPoint could not afford to lose Mr. Kaplan's work with GM in November 2008 but by February 2009, the situation had changed. After realizing that it could not avoid its significant contractual obligations to Mr. Kaplan by terminating him "with cause," GridPoint offered Mr. Kaplan a Hobson's choice. His options were reporting to Mr. Clark or "voluntarily" leaving the Company with a separation package far less than

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 9 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

what he was owed under his Employment and Stock Restriction Agreements for a termination without cause.

An employer may effectively discharge an employee through intentionally precipitating a resignation, though formally retaining the employee on the books, in an attempt to avoid liability for compensation under a severance pay plan. *Barrett*, 40 Wn. App. at 636. In February 2009 GridPoint offered Mr. Kaplan a position reporting to Mr. Clark as his sole option for remaining with the Company expecting that he would quit, thus saving the Company millions in cash and stock. Mr. Lach's February 2009 e-mails leave no doubt that GridPoint wanted Mr. Kaplan removed from the Company given that he would not cave on his non-negotiable condition of not reporting to Mr. Clark.

No reasonable person in Mr. Kaplan's position would have agreed to report to Mr. Clark in late February 2009. Mr. Kaplan had worked with Mr. Clark for over a year at V2Green and their relationship had been acrimonious. Mr. Kaplan knew Mr. Clark blamed him for the May 2008 Performance Improvement Plan that had threatened Mr. Clark with termination. The working relationship between Mr. Clark and Mr. Kaplan declined even further after May 2008. Mr. Kaplan had supplanted Mr. Clark as head of the Seattle office in September 2008. Mr. Clark considered Mr. Kaplan a "psychopath." Mr. Lewis had removed Mr. Clark from Mr. Kaplan's chain of command in September 2008 because Mr. Kaplan and Mr. Clark were incapable of working together. On February 26, 2009, Mr. Clark wrote to Mr. Lach and Mr. Corsell that he was "scared" Mr. Kaplan might accept the OEM position reporting to Mr. Clark.

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 10 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

*Statutory Claims*

RCW 49.48.010 requires an employer to pay all wages due to a discharged employee by the end of the established pay period. Severance payments due to an employee under his employment agreement qualify as wages under Washington law. *Dice v. City of Montesano*, 131 Wn. App. 675, 687, 128 P.2d 1253 (2006). If the Court finds for Mr. Kaplan on his breach of contract claim, it will *ipso facto* find for him on his claim for failure to pay wages under RCW 49.48.010.

RCW 49.52 provides that any employer who willfully fails to pay wages due shall be liable to the aggrieved employee for twice the amount of wages it has unlawfully and willfully withheld. To take advantage of RCW 49.52.070, the employee must show the employer (1) willfully withheld (2) wages. *Id.* The test for whether the failure to pay is willful is not stringent. The employer's refusal to pay must simply be volitional. "Willful means merely that the person knows what he is doing, intends to do what he is doing and is a free agent." *Id.* at 159-60 (internal quotations omitted). It is beyond dispute that GridPoint's failure to pay Mr. Kaplan his entire severance compensation was "willful" under this definition.

Even where the test for willfulness is met, RCW 49.52.070 provides the employer with two affirmative defenses or "excuses." *Id.* at 160-61. The employer can escape liability by showing either (1) "mere carelessness or inadvertence" or (2) the existence of a bona fide dispute. *Id.* The employer's proof of either of these offenses will "negate the willfulness necessary to invoke double damages under RCW 49.52.070." *Id.* at 161. GridPoint has never claimed its failure to pay Mr. Kaplan the severance due under his Employment Agreement was a result of mere carelessness or inadvertence.

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 11 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Therefore, its only escape from double damages liability lies in proof of a "bona fide dispute" whether the payments at issue were due.

"Bona fide" literally means "good faith." In the context of determining whether an employee is entitled to double or liquidated damages for an employer's failure to pay wages, "good faith" has both an objective and subjective component. *Moore v. Blue Frog Mobile Inc.,* 153 Wn. App. 1, 8-9, 221 P.3d 913 (2009). Unless the evidence shows that GridPoint both subjectively and objectively believed in good faith that it had a legal right not to pay Mr. Kaplan the one year of severance due to him under his Employment Agreement for a termination without cause, GridPoint is liable for double damages under RCW 49.52.070. Mr. Kaplan believes that after the Court reviews the evidence and the assesses the credibility of the trial witnesses, it will find there is no "bona fide dispute" that Mr. Kaplan's Employment Agreement was a contract for a specific position and his removal as General Manager of EVM triggered the Company's contractual obligations for a termination without cause. Furthermore, the Court has already ruled in its summary judgment order that GridPoint will be liable for double damages if it intentionally precipitated Mr. Kaplan's resignation.

### Relief to Which Mr. Kaplan is Entitled

Mr. Kaplan's Employment Agreement provided for one year of base pay if his employment were terminated without cause during the contract's three year term. Mr. Kaplan's annual base salary was $205,000. If the court finds in favor of Mr. Kaplan on his claim under RCW 49.52, he will also be entitled to an award of double damages.

Prejudgment interest is allowed in civil litigation at the statutory judgment interest rate when a party to the litigation retains funds rightfully belonging to another.

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 12 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

*Mahler v. Szucs*, 135 Wn.2d 398, 429, 957 P.2d 632 (1998). An award of prejudgment interest is based on the principle that when a defendant retains money that is owed to another, it should be charged interest upon it to compensate the plaintiff for the loss of its use. *Hadley*, 120 Wn. App. at 141; *Dautel v. Heritage Home Ctr., Inc.*, 89 Wn. App. 149, 154, 948 P.2d 397 (1997).

Prejudgment interest is favored in the law because it promotes justice. *Seattle-First Nat. Bank v. Washington Insurance Guaranty Ass'n*, 94 Wn. App. 744, 760, 972 P.2d 1282 (1999). Washington law has historically treated prejudgment interest as a matter of right when a party prevails on a claim for a liquidated amount. *Dautel*, at 89 Wn. App. at 153. If Mr. Kaplan prevails on any of his claims, he will be entitled to prejudgment interest on the $205,000 severance amount owed to him under his Employment Contract from February 24, 2009, to the date of the entry of judgment at the statutory rate of 12%. RCW 4.56.110; RCW 19.52.020.

An employee who prevails in a legal dispute in which he recovers "wages," is entitled to his reasonable attorneys' fees and costs. RCW 49.48.030. If Mr. Kaplan prevails on any of his legal clams, he will be entitled to an award of reasonable attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 19th day of April 2010

FRANK FREED SUBIT & THOMAS LLP


/s/Michael C. Subit
MICHAEL C. SUBIT, WSBA #29189
Attorneys for Plaintiff David Kaplan

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 13 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2010, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>Jeffrey B. Youmans
>Courtney E. Mertes
>Davis Wright Tremaine
>1201 Third Avenue, Suite 2200
>Seattle, WA 98101-3045
>Telephone: 206.622.3150
>Facsimile: 206.757.7700
>Email: jeffreyyoumans@dwt.com
>Email: courtneymertes@dwt.com
>
>Karla Grossenbacher
>Raymond C. Baldwin
>975 F. Street NW
>Washington, DC 20004
>Telephone: 202.463.2400
>Facsimile: 202.828.5393
>Email: kgrossenbacher@seyfarth.com
>Email: rbaldwin@seyfarth.com

Dated: April 19, 2010      /s/Susan Zimmerman
                           Susan Zimmerman

PLAINTIFF'S TRIAL BRIEF
C09-0468 JLR
Page 14 of 14

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711