The Honorable James L. Robart

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID KAPLAN,

               Plaintiff,

    v.

GRIDPOINT, INC.,

               Defendant.

Case No.: C09-0468 JLR

PLAINTIFF'S PROPOSED
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Where appropriate, Findings of Fact should be deemed Conclusions of Law and

Conclusions of Law deemed Findings of Fact.

## FINDINGS OF FACT

1.     In 2006 David Kaplan founded V2Green, a Seattle clean energy company

that made connectivity technology to allow electric vehicles to interface with a power

grid.

2.     Mr. Kaplan developed and supplied the Company's core intellectual

property. He and his wife supplied almost 95% of the $1 million in seed capital for the

venture.

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -1

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

3.      Mr. Kaplan recruited two engineers, Seth Pollack and Seth Bridges, and designated them as co-founders.

4.      Mr. Kaplan was originally both Chairman of the Board and Chief Executive Officer.   In the summer of 2007, V2Green hired John Clark as Chief Operating Officer and President.   In November 2007, Mr. Kaplan offered Mr. Clark the position of CEO.   Mr. Kaplan kept the titles of Chairman of the Board and Chief Technology Officer.

5.      V2Green had an unusual reporting relationship under which Mr. Kaplan reported to Mr. Clark for operational purposes, but Mr. Clark ultimately answered to him as the Chair of the Board of Directors.   Mr. Kaplan was still V2Green's majority shareholder.

6.      While Mr. Clark made valuable contributions to V2Green in terms of business development, he treated people in a bullying and aggressive manner.

7.      On the Sunday after Thanksgiving 2007, Mr. Kaplan and Mr. Clark were speaking on the telephone about a bid submission to Google and whether someone other than Mr. Clark's wife should perform some of the work.   Mr. Clark blew-up at Mr. Kaplan and went on a diatribe that lasted for almost an hour.

8.      Mr. Clark's bullying behavior towards Mr. Kaplan, Mr. Pollack, and other V2Green employees recurred on numerous occasions.   By May 2008 there was consensus among Mr. Kaplan, Mr. Pollack and Mr. Bridges to put Mr. Clark on a Performance Improvement Plan ("PIP").

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -2

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

9.      Mr. Clark was given the PIP on May 23, 2008.  The PIP gave Mr. Clark three months to improve his behavior or face potential termination.  Mr. Clark held Mr. Kaplan responsible for the issuance of the PIP.

10.     The precipitating cause for the PIP was Mr. Clark's highly negative reaction to a meeting between Mr. Kaplan and GridPoint.  GridPoint had opened a "get to know you better" dialogue with V2Green in January 2008.  Mr. Kaplan asked Mr. Clark to meet with GridPoint in March 2008.  In early April Mr. Kaplan informed Mr. Clark that he was planning on meeting with GridPoint as well.  Mr. Clark responded that Mr. Kaplan should not meet with GridPoint without Mr. Clark present.   After Mr. Kaplan returned from the meeting, Mr. Clark told him: "You see, you went back there and screwed it up just like I said you would."

11.     Mr. Kaplan's and Mr. Clark's relationship further deteriorated after the issuance of the PIP.  This coincided with on-going discussions with GridPoint about acquiring V2Green.  On July 16 Mr. Kaplan and Mr. Clark met with GridPoint's Board of Directors.  Mr. Kaplan and Mr. Clark agreed that Mr. Clark would be the primary spokesperson for V2Green as long as Mr. Kaplan had an opportunity to deliver concluding remarks to the GridPoint Board of Directors as V2Green's Chairman and majority shareholder.  Mr. Clark, however, used up the entire allotted time himself and did not allow Mr. Kaplan to make those remarks.

12.     When Mr. Clark and Mr. Kaplan returned to V2Green's offices in Seattle the next day, Mr. Kaplan told Mr. Clark that under no circumstances would Mr. Kaplan work for him after the acquisition.  Mr. Kaplan then informed both Mr. Pollack and Mr.

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -3

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

Bridges he would not accept a role within GridPoint reporting to Mr. Clark.  Mr. Kaplan was unwavering in his refusal to report to Mr. Clark.

13.     As primary shareholder and Chairman of the Board, Mr. Kaplan set the large-scale terms of V2Green's negotiations with GridPoint regarding the acquisition, including the purchase price.

14.     On August 5, 2008, Mr. Kaplan spoke by telephone with GridPoint's President and Chief Executive Officer, Peter Corsell, and Chief Operating Officer, Karl Lewis, about his future position within GridPoint.  He told them that he would not report to Mr. Clark within GridPoint.  He also told them his preferred option was that Mr. Clark would head GridPoint's Seattle office – which would ultimately be known as the Electric Vehicle Management ("EVM") Group – and that he have a senior role within GridPoint outside Mr. Clark's chain of command.

15.     During August and September 2008, Mr. Kaplan repeatedly informed both Mr. Lewis and Mr. Corsell that he would not report to Mr. Clark within GridPoint under any circumstances.

16.     GridPoint understood that specification of the exact roles and responsibilities of the four V2Green principals and execution of employment agreements for them were conditions to consummation of the acquisition of V2Green.

17.     Mr. Kaplan, Mr. Corsell and Mr. Lewis met for about three hours on September 3 to discuss his role within GridPoint.  Mr. Kaplan required a senior role in GridPoint and the Company insisted he remain within EVM.  The meeting established that the only role for Mr. Kaplan that was acceptable to both Mr. Kaplan and GridPoint was as General Manager of EVM.

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -4

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

18.     At the September 3, 2008, meeting GridPoint and Mr. Kaplan mutually decided that Mr. Kaplan would be the General Manager of EVM. Mr. Lewis told Mr. Kaplan that they would find some role for Mr. Clark outside of EVM but, until they did, Mr. Clark would report to Mr. Kaplan.

19.     Mr. Kaplan would not have permitted GridPoint's acquisition of V2Green to occur if GridPoint had not agreed to Mr. Kaplan's condition that he not report to Mr. Clark.

20.     Even before the acquisition of V2Green had closed, GridPoint was already contemplating removing Mr. Kaplan as General Manager of EVM and replacing him with Mr. Clark once the acquisition closed.

21.     GridPoint's acquisition of V2Green closed on September 19 and V2Green became a wholly-owned subsidiary. Mr. Kaplan's Employment Agreement with GridPoint became effective the same day.

22.     Mr. Kaplan's Employment Agreement is a contract for the specific position of EVM General Manager. Those were the only duties the parties contemplated he would perform at the time he became a GridPoint employee, as long as the position of General Manager of EVM existed.

23.     There were no discussions between the parties during the negotiation of the Employment Agreement as to the meaning of the word "initially."

24.     On September 22, Michael Lach replaced Karl Lewis as the Company's COO. Mr. Lewis assumed the title of Chief Strategy Officer. Mr. Kaplan continued to report to Mr. Lewis. Days later, Mr. Lewis removed Mr. Clark from Mr. Kaplan's team and reassigned him to corporate development.

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

25.     On November 18, Mr. Pollack and Mr. Bridges raised concerns about Mr. Kaplan's management of EVM with Mr. Lach and Mr. Lewis.  The next day, Mr. Lewis informed Mr. Kaplan that he and Mr. Lach were planning to replace Mr. Kaplan with Mr. Clark as General Manager of EVM and leave Mr. Kaplan to focus on the automotive industry.  Mr. Kaplan told Mr. Lewis his removal as General Manager of EVM was unacceptable.

26.     Later that day, Mr. Lewis then wrote Mr. Lach an e-mail setting forth GridPoint's options for dealing with Mr. Kaplan.  One option was putting Mr. Clark in charge of EVM.  Mr. Lewis stated that if that were done, some other role would have to be found for Mr. Kaplan outside of EVM or else Mr. Kaplan would leave GridPoint. Mr. Lewis noted that if Mr. Kaplan quit, the Company would save 1/3 of the cost associated with him.  *Id.*  Mr. Lewis was specifically referring to the GridPoint vesting schedule that was set out in Mr. Kaplan's Stock Restriction Agreement.

27.     In this same e-mail Mr. Lewis told Mr. Lach that the only downside he saw for GridPoint from putting Mr. Clark in charge of EVM and precipitating Mr. Kaplan's departure would be losing the excellent job Mr. Kaplan had done working with General Motors.  Mr. Lewis noted that GridPoint did not yet have the ability to replace Mr. Kaplan's value to the Company in that respect.

28.     After several days of discussion in November 2009, it was ultimately agreed that Mr. Kaplan would remain as General Manager of EVM but reporting to Mr. Lach instead of Mr. Lewis.

29.     On January 16, 2009, Mr. Lach wrote an e-mail to Mr. Pollack and Mr. Bridges asking how Mr. Kaplan had performed as General Manager of EVM since

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -6

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

November.  Mr. Pollack responded that "things are much improved.  Mr. Bridges also reported Mr. Kaplan had made progress with respect to the issues that had been raised in November.

30.     On January 27, 2009, Messrs. Corsell and Lewis agreed to Mr. Lach's plan for "parting ways with Mr. Kaplan" and reinstalling Mr. Clark as head of the Seattle office.

31.     On January 27 Mr. Lach met with his assistant Karen Wirz to discuss putting together documentation "against" Mr. Kaplan to terminate his employment "with cause."  GridPoint soon realized that it could not establish "cause" to dismiss Mr. Kaplan and abandoned the attempt.

32.     In February 2009 GridPoint decided that, if Mr. Kaplan wasn't going to reverse his repeated refusal to report to Mr. Clark, it would precipitate Mr. Kaplan's "voluntary" resignation and thereby avoid its already existing financial obligations to him under the Employment and Stock Restriction Agreements for a termination without cause.

33.     Mr. Kaplan was directed to a meeting with Mr. Corsell and Mr. Lach in Arlington on February 23.  Mr. Kaplan was informed Mr. Clark would be replacing him as General Manger of EVM.

34.     Mr. Lach told Mr. Kaplan that he wanted him to work with the automotive industry reporting to Mr. Clark.  Mr. Kaplan reminded Mr. Corsell and Mr. Lach that during the acquisition negotiations he had repeatedly stated that he would not accept a role within GridPoint reporting to Mr. Clark.  Mr. Kaplan reiterated that he would not work for Mr. Clark under any circumstances.

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -7

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1300 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

35.     GridPoint understood that if it directed Mr. Kaplan to report to Mr. Clark this would create working conditions Mr. Kaplan would find intolerable.

36.     Mr. Kaplan, Mr. Lach, and Mr. Corsell then began discussing whether there were any alternative positions for Mr. Kaplan within GridPoint.  Mr. Corsell also proposed Mr. Kaplan's separation from GridPoint as another option.

37.     Mr. Kaplan's future status was not resolved at the February 23 meeting.

38.     A reasonable person in Mr. Kaplan's position in late February 2009 would have found reporting to Mr. Clark to be intolerable working conditions.

39.     On the morning of February 24, 2009, Mr. Kaplan wrote an e-mail to Mr. Corsell and Mr. Lach that outlined both their discussion of the night before and the options going forward.  Mr. Kaplan stated that he "can't be in a limbo state, where I am out of my current job without clear agreement on my new role (or exit terms)."

40.     Mr. Lach and Mr. Kaplan met on February 24th.  The only time Mr. Lach would meet with Mr. Kaplan on February 24 was at the end of the day, 30 minutes before he knew Mr. Kaplan had to leave for the airport. During their meeting on February 24, Mr. Lach shot down or expressed no interest in every proposal that Mr. Kaplan made for an alternative role within GridPoint. Mr. Lach made clear to Mr. Kaplan that there was no role for him in Mr. Lach's organization.

41.     A few minutes after the conclusion of the meeting between Mr. Kaplan and Mr. Lach, and unbeknownst to Mr. Kaplan, Ms. Wirz sent to the Seattle office an e-mail that Mr. Lach had dictated.  The e-mail informed them that Mr. Clark was taking over as head of EVM and that all of Mr. Kaplan's subordinates would now be reporting

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

1  to Mr. Clark.  Mr. Lach wrote that Mr. Kaplan's "ongoing role within the organization

2  remains under discussion."

3       42.     There were, however, no further discussions between GridPoint and Mr.

4  Kaplan over an ongoing role for him within the organization.  Mr. Kaplan returned to his

5  office on the morning of February 25 and discovered his removal as General Manager of

6  EVM.  Mr. Kaplan had left a voice mail for Mr. Corsell on February 24 to talk about

7  where things stood, but Mr. Corsell never returned his call.

8

9       43.     On February 25 Mr. Lach wrote Mr. Corsell and Mr. Lewis:  "We should

10  move to negotiate an exit."  The next day, Mr. Corsell contacted the GridPoint Board of

11  Directors Compensation Committee about a severance package for Mr. Kaplan.

12       44.     On February 26 Mr. Lach wrote an e-mail to Mr. Corsell and Mr. Clark

13  stating the following:

14

15       Peter, you mentioned he already had a call into you—I believe you are
        already in discussions with him re: a departure.  That needs to be cared
16       for asap.  He will go slow so this needs to be pushed hard from your side.
        I would not have him in the office past whatever transition work is
17       underway over the next week given the fact that he refused to work for
        John who is now running it.  This is something you'll have to make clear
18       to him as you work his exit.  We can't allow this dysfunction to remain.
        Kaplan needs to be removed.

19

20       45.     By March 2 the only option GridPoint was considering was a separation

21  package for Mr. Kaplan, but one far less generous than its already existing obligations to

22  him under the Employment and Stock Restriction Agreements for the termination of his

23  employment without cause.

24       46.     Following his removal as General Manager of EVM, Mr. Kaplan was not

25  appointed to the position of director of business development for the Original Equipment

26

27

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

Manufacturers ("OEM") prior to March 2, 2009, or to any other position within GridPoint.

47.     Between February 25 and March 2, Mr. Kaplan's only role within GridPoint had been to ensure the smooth transition of management of the EVM group, a task he had volunteered to take on. Mr. Kaplan had no title or formal position within the Company

48.     On March 2 Mr. Kaplan's legal counsel sent Mr. Corsell a letter stating that GridPoint had terminated Mr. Kaplan's employment "without cause" within the meaning of his Employment and Stock Restriction Agreements. Among other things, the letter claimed that Mr. Kaplan had no current position or title within GridPoint.

49.     Mr. Corsell called Mr. Kaplan at home on the night of March 2. Mr. Corsell was angry and verbally abusive. Mr. Corsell insisted that Mr. Kaplan had not been terminated. He admitted, however, that Mr. Kaplan was "in limbo" with no defined role. Mr. Corsell said he had been working with the Board of Directors' Compensation Committee on a severance package. Mr. Corsell said he understood that Mr. Kaplan would not work for Mr. Clark, and the Company had respected that. Mr. Corsell demanded Mr. Kaplan retract his claim he had been terminated. If Mr. Kaplan did, Mr. Corsell said he would be willing to negotiate a separation package for him.

50.     Following the receipt of the letter from counsel asserting Mr. Kaplan had no position or title within GridPoint, Mr. Clark and Mr. Corsell began falsely claiming that on February 23 Mr. Kaplan had been formally appointed to the position of head of OEM business development, reporting to Mr. Clark.

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -10

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

51.     Mr. Kaplan's last day of performing work at GridPoint was March 5, 2009.

52.     Under the terms of his Employment Agreement, Mr. Kaplan was entitled to receive a one-time lump sum in payment in an amount equal to twelve (12) months of his then-current base salary if he were terminated without cause.  Mr. Kaplan's annual base salary was $205,000.  Mr. Kaplan has not been paid any severance under his Employment Agreement.

53.     After reviewing the evidence and after assessing the credibility of the witnesses, the Court finds there is no bona fide dispute that Mr. Kaplan's employment was terminated without cause within the meaning of his Employment Agreement and that GridPoint has willfully refused to pay Mr. Kaplan his severance.

**CONCLUSIONS OF LAW**

The court's primary goal in interpreting a contract is to ascertain the parties' intent. *Paradise Orchards General Partnership v. Fearing*, 122 Wn. App. 507, 516, 94 P.3d 372 (2004).  In determining this, the court considers (1) the contract as a whole; (2) the subject matter and objective of the contract; (3) all the circumstances surrounding the making of the contract; (4) the subsequent acts and conduct of the parties to the contract; and (5) the reasonableness of the respective interpretations advocated by the parties. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996); *Paradise Orchards*, 122 Wn. App. at 516; *Martinez v. Miller Industries, Inc.*, 94 Wn. App. 935, 943, 974 P.2d 1261 (1999).

A discharge from employment occurs when the employer indicates by words or acts an intention to dispense with the employee's services.  *Barrett v. Weyerhaeuser*

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -11

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

*Company Severance Pay Plan*, 40 Wn. App. 630, 636, 700 P.2d 338 (1985).   In determining whether an employer has indicated an intention to discharge the employee, cases that apply the doctrine of constructive discharge provide useful guidance.   *Id.* at n.7.   If an employer removes the very job duties that at the time of hire the parties specifically contemplated the employee would perform, this manifests the employer's intent to terminate the employee.   *Id.* at 637.

*Barrett*'s definition of "termination" is consistent with a legion of cases from other jurisdictions dating back nearly a century involving employment agreements for a specific position.   Together these cases establish a rule that when an executive is hired for a particular position, a material change in duties or removal from the position amounts to an effective discharge and a breach of the employment agreement.   *See e.g.,* *Hondares v. TSS-Seedman's Stores, Inc.*, 543 N.Y.S.2d 442, 151 A.D.2d 411 (1989); *Kass v. Brown Boveri Corp.*, 199 N.J. Super. 42, 488 A.2d 242 (1985); *Sanders v. May Broadcasting Co.*, 214 Neb. 755, 336 N.W.2d 92 (1983); *Miller v. Winshall*, 9 Mass. App. Ct. 312, 400 N.E.2d 1306 (1980); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 280 N.E.2d 867 (1972); *Hayes v. Resource Control, Inc.*, 170 Conn. 102, 104, 365 A.2d 399 (1976); *McLaughlin v. Union-Leader Corp.*, 99 N.H. 492, 116 A.2d 489 (1955); *Mair v. Southern Minnesota Broadcasting Co.*, 226 Minn. 137, 140, 32 N.W.2d 177 (1948); *Marks v. Cowdin*, 226 N.Y. 138, 146-47, 123 N.E. 139 (1919).

Taking into account (1) the terms of Mr. Kaplan's Employment Agreement; (2) its subject matter and objective; (3) all the circumstances surrounding the making of the Employment Agreement; (4) the subsequent acts and conduct of GridPoint and Mr. Kaplan; and (5) the reasonableness of the respective interpretations advocated by the

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -12

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

parties, the Court concludes that Mr. Kaplan's Employment Agreement was a contract for the specific position of General Manager of EVM.   At the time of his hire by GridPoint these were the only duties the parties contemplated that he would perform for the Company, at least while the position of General Manager of EVM still existed. GridPoint did not reserve the unilateral right to remove Mr. Kaplan from the position of General Manager of EVM and reassign him to some other position,

Furthermore, an employer may effectively discharge an employee through intentionally precipitating a resignation, though formally retaining the employee on the books, in an attempt to avoid liability for compensation under a severance pay plan. *Barrett*, 40 Wn. App. at 636.  In February 2009 GridPoint offered Mr. Kaplan a position reporting to Mr. Clark as his only option for remaining with the Company in an attempt to avoid triggering its obligations to him under his Employment and Stock Restriction Agreements with respect to a termination without cause.

GridPoint discharged Mr. Kaplan from employment without cause within the meaning of his Employment Agreement on February 24, 2009.  GridPoint has failed to pay Mr. Kaplan severance in breach of that agreement.

RCW 49.48.010 requires an employer to pay all wages due to a discharged employee by the end of the established pay period.  Severance payments due to an employee under his employment agreement qualify as wages under Washington law. *Dice v. City of Montesano*, 131 Wn. App. 675, 687, 128 P.2d 1253 (2006).

By failing to pay Mr. Kaplan the severance owed to him under his Employment Agreement, GridPoint has violated RCW 49.48.010.

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -13

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

1    Mr. Kaplan is entitled to an award of severance pay against GridPoint in the

2    amount of $205,000.

3    RCW 49.52 provides that any employer who willfully fails to pay wages due

4    shall be liable to the aggrieved employee for twice the amount of wages it has unlawfully

5    and willfully withheld.

6    By acting willfully and with intent to deprive Mr. Kaplan of the severance owed

7

8    to him under his Employment Agreement, GridPoint violated RCW 49.52.  Mr. Kaplan

9    is therefore entitled to an award of double damages.

10   Prejudgment interest is allowed in civil litigation at the statutory judgment

11   interest rate when a party to the litigation retains funds rightfully belonging to another.

12   *Mahler v. Szucs*, 135 Wn.2d 398, 429, 957 P.2d 632 (1998).  An award of prejudgment

13

14   interest is based on the principle that when a defendant retains money that is owed to

15   another, it should be charged interest upon it to compensate the plaintiff for the loss of its

16   use. *Dautel v. Heritage Home Ctr., Inc.*, 89 Wn. App. 149, 154, 948 P.2d 397 (1997).

17   Prejudgment interest is favored in the law because it promotes justice.  *Seattle-*

18   *First Nat. Bank v. Washington Insurance Guaranty Ass'n*, 94 Wn. App. 744, 760, 972

19   P.2d 1282 (1999).  Washington law has historically treated prejudgment interest as a

20   matter of right when a party prevails on a claim for a liquidated amount.  *Dautel*, at 89

21   Wn. App. at 153.

22   Mr. Kaplan is entitled to prejudgment interest on the $205,000 severance amount

23   from February 24, 2009, to the date of the entry of judgment, _____, 2010, at the

24

25   statutory rate of 12%, totaling $_____.  RCW 4.56.110; RCW 19.52.020.

26

27

FRANK FREED
SUBIT & THOMAS LLP
SUITE 1200 HOGE BUILDING, 705 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1798
(206) 682-6711

1       An employee who prevails in a legal dispute in which he recovers "wages" is

2   entitled to his reasonable attorneys' fees and costs.  RCW 49.48.030.   Mr. Kaplan is

3   entitled to an award of reasonable attorneys' fees and costs.

4       RESPECTFULLY SUBMITTED this 19th day of April 2010

5                   FRANK FREED SUBIT & THOMAS LLP

6

7

8                   /s/Michael C. Subit
                MICHAEL C. SUBIT, WSBA #29189

9                   Attorneys for Plaintiff David Kaplan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -15

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2010, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jeffrey B. Youmans
Courtney E. Mertes
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA  98101-3045
Telephone:  206.622.3150
Facsimile:  206.757.7700
Email:  jeffreyyoumans@dwt.com
Email:  courtneymertes@dwt.com

Karla Grossenbacher
Raymond C. Baldwin
975 F. Street NW
Washington, DC  20004
Telephone:  202.463.2400
Facsimile:  202.828.5393
Email:  kgrossenbacher@seyfarth.com
Email:  rbaldwin@seyfarth.com

Dated: April 19, 2010      /s/Susan Zimmerman
                           Susan Zimmerman

PLAINTIFF'S PROPOSED FINDINGS
& CONCLUSIONS
C09-0468 JLR -16

FRANK FREED
SUBIT & THOMAS LLP
Suite 1200 Hoge Building, 705 Second Avenue
Seattle, Washington 98104-1798
(206) 682-6711