1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   DAVID KAPLAN,                         CASE NO. C09-0468JLR

11              Plaintiff,                 FINDINGS OF FACTS AND
                                           CONCLUSIONS OF LAW
12          v.

13   GRIDPOINT, INC.,

14              Defendant.

15          This matter came on for trial on May 3, 4, and 5, 2010, before the court sitting

16   without a jury.  Plaintiff David Kaplan was represented by Michael C. Subit of Frank

17   Freed Subit & Thomas, LLP.  Defendant GridPoint, Inc. was represented by Karla

18   Grossenbacher of Seyfarth Shaw LLP.  The court has considered the testimony presented

19   at trial, the exhibits admitted into evidence, and the arguments of counsel.  The court has

20   weighed the testimony, exhibits, and evidence using the required "preponderance of the

21

22

ORDER- 1

evidence" standard.  Now the court, being fully advised, makes its Findings of Fact and Conclusions of Law as follows:

## I.     FINDINGS OF FACT

1.      In 2006, David Kaplan founded V2Green, a Seattle clean energy company that made connectivity technology to allow electric vehicles to interface with a power grid.

2.      Mr. Kaplan developed and supplied the company's core intellectual property.  He and his wife, Anita Kaplan, supplied almost 95% of the $1 million in seed capital for the venture.

3.      Mr. Kaplan recruited two engineers, Seth Pollack and Seth Bridges, and designated them as co-founders.  V2Green was officially formed in December 2006.  Mr. Kaplan was originally both Chairman of the Board and Chief Executive Officer ("CEO"). Mr. Pollack and Mr. Bridges were the other original directors.  Jointly with his wife, Mr. Kaplan was V2Green's majority shareholder

4.      In August 2007, V2Green hired John Clark as Chief Operating Officer ("COO") and President, at Mr. Kaplan's suggestion.  In his capacity as COO, Mr. Clark reported to Mr. Kaplan.  Mr. Clark also joined the Board of Directors.

5.      On November 21, 2007, Mr. Kaplan offered Mr. Clark the position of CEO with the consent of both Mr. Pollack and Mr. Bridges.  Mr. Kaplan kept the titles of Chairman of the Board and Chief Technology Officer.  Mr. Kaplan was still V2Green's majority shareholder.

6.      Mr. Clark's promotion to CEO created an unusual reporting relationship under which Mr. Kaplan reported to Mr. Clark for operational purposes, but Mr. Clark ultimately answered to him as the Chair of the Board of Directors.

7.      While Mr. Clark made valuable contributions to V2Green in terms of business development, at times he treated co-workers, including Mr. Kaplan and Mr. Pollack, in a bullying and aggressive manner.  On at least one occasion, Mr. Clark admitted to "losing his cool" with Mr. Kaplan because he thought Mr. Kaplan was questioning his judgment.

8.      In March 2008, GridPoint expressed interest in acquiring V2Green.

9.      In May 2008, having had enough of Mr. Clark's bullying, passive-aggressive, and controlling behavior, Mr. Kaplan, Mr. Pollack and Mr. Bridges put Mr. Clark on a Performance Improvement Plan ("PIP").  Exhibit 1.  Mr. Clark was given the PIP on May 23, 2008.

10.     The PIP gave Mr. Clark three months to improve his behavior or face the potential termination of his employment.  Exhibit 1.  Despite the three month deadline, the PIP was not mentioned again by any of the parties involved with it.

11.     Mr. Kaplan and Mr. Clark's relationship further deteriorated after the issuance of the PIP.  This coincided with on-going discussions with GridPoint about acquiring V2Green.

12.     On July 16, 2008, Mr. Kaplan and Mr. Clark met with GridPoint's Board of Directors to discuss a possible acquisition.  Before the meeting, Mr. Kaplan and Mr. Clark had agreed that Mr. Clark would be the primary spokesperson for V2Green as long

1  as Mr. Kaplan had an opportunity to deliver concluding remarks to the GridPoint Board

2  of Directors as V2Green's Chairman and majority shareholder.  Mr. Clark, however, used

3  up the entire allotted time himself and did not allow Mr. Kaplan to make those remarks.

4       13.     After the board meeting, the parties negotiated the terms of the acquisition.

5  The plan was that the current V2Green entity would become a business unit within

6  GridPoint, which was eventually called the Electric Vehicle Management ("EVM")

7  group.  The original plan negotiated by the parties was to have Mr. Clark serve as the

8  CEO of the newly formed EVM group.

9       14.     Mr. Kaplan was upset at Mr. Clark for not allowing him to make his

10  remarks to the GridPoint Board of Directors.  When Mr. Clark and Mr. Kaplan returned

11  to V2Green's offices in Seattle the next day, Mr. Kaplan told Mr. Clark that he would not

12  work for Mr. Clark after the acquisition.

13       15.     That same day Mr. Kaplan informed both Mr. Pollack and Mr. Bridges that

14  he would not accept a role within GridPoint reporting to Mr. Clark.  Mr. Kaplan repeated

15  this condition to the V2Green principals several times over the negotiation period.

16       16.     Mr. Kaplan was unwavering in his desire not to report to Mr. Clark once

17  the acquisition had been completed.

18       17.     Mr. Kaplan insisted on leading the negotiations between GridPoint and

19  V2Green regarding the acquisition.  During the negotiations Mr. Kaplan told GridPoint's

20  President and CEO, Peter Corsell, and COO, Karl Lewis, that he would not report to Mr.

21  Clark within GridPoint.  Mr. Kaplan requested a senior management position with

22  GridPoint that would be outside Mr. Clark's chain of command.

1    18.    Mr. Kaplan consistently stressed the importance of in-person discussions

2 with GridPoint's management to explore and define roles and responsibilities following

3 the acquisition.

4    19.    Mr. Lewis told Mr. Kaplan that GridPoint wanted his role to be one

5 working with the automotive industry, also referred to as the Original Equipment

6 Manufacturers ("OEM"), because much of Mr. Kaplan's time over the past year had been

7 spent working with General Motors and other auto-industry OEMs and GridPoint wanted

8 to take advantage of Mr. Kaplan's goodwill with these companies.  Mr. Kaplan, however,

9 did not want this work to be his long-term primary focus.  Mr. Kaplan made that clear to

10 both Mr. Lewis and Mr. Corsell.

11    20.    Mr. Kaplan, Mr. Corsell, and Mr. Lewis met for approximately three hours

12 on September 3, 2008, to discuss Mr. Kaplan's role within GridPoint.  Mr. Kaplan and

13 Mr. Corsell gave significantly different accounts of what transpired during that meeting.

14 Mr. Lewis's testimony regarding the September 3rd meeting was generally consistent

15 with Mr. Kaplan's testimony and inconsistent with Mr. Corsell's testimony on numerous

16 critical points.

17    21.    The court did not find Mr. Corsell to be a credible witness and therefore

18 discounts his testimony.

19    22.    Early in the meeting Mr. Kaplan informed Mr. Lewis and Mr. Corsell that

20 he believed he was making a 10-year personal commitment and wanted to be given a

21 suitable senior role within GridPoint following the acquisition.  As one possibility, Mr.

22 Kaplan suggested that he be given the position of Chief Technology Officer, which was

1    the same position he held at V2Greeen.  Mr. Kaplan also said that if GridPoint were

2    unwilling to give him a senior role, he would be willing to leave GridPoint following the

3    acquisition after a brief transition period.

4            23.     GridPoint rejected both of these options and requested that Mr. Kaplan

5    remain part of EVM once GridPoint acquired V2Green.  GridPoint reiterated that it

6    wanted Mr. Kaplan to fill the OEM role.  Mr. Kaplan responded to both Mr. Corsell and

7    Mr. Lewis that he would not go forward with any arrangement that required him to report

8    to Mr. Clark.  The OEM role GridPoint offered to Mr. Kaplan fell directly within EVM.

9    Mr. Corsell and Mr. Lewis made clear both before and during the September 3rd meeting

10   that they wanted Mr. Clark to run EVM.

11           24.     Mr. Lewis finally proposed during the September 3rd meeting that Mr.

12   Kaplan run EVM and that GridPoint would find a role for Mr. Clark outside of EVM

13   following a transition period.  Mr. Kaplan agreed to GridPoint's proposal.

14           25.     Shortly after the September 3rd meeting, Mr. Pollack and Mr. Bridges

15   telephoned Mr. Lewis to learn GridPoint's reasons for making Mr. Kaplan head of EVM

16   rather than the logical appointment of Mr. Clark to that role.  Mr. Lewis told them that,

17   because Mr. Kaplan was V2Green's majority shareholder, the acquisition could not go

18   forward unless there was an agreement between Mr. Kaplan and GridPoint about his role.

19           26.     As V2Green's majority shareholder Mr. Kapan had the ability to veto the

20   acquisition transaction.

21           27.     Before the V2Green acquisition deal was even signed, GridPoint began

22   working on a contingency plan in case Mr. Kaplan did not perform well as the CEO of

ORDER- 6

EVM.  On September 17, 2008, Mr. Lewis sent Mr. Corsell an e-mail stating that he was "getting Mr. Clark out from Mr. Kaplan" as soon as possible, but was keeping Mr. Clark in the wings in case GridPoint needed "to let Dave [Kaplan] go."  Exhibit 21.

28.     GridPoint's acquisition of V2Green closed on September 19, 2008, and V2Green became a wholly-owned subsidiary of GridPoint as of that date.  Also on September 19, 2008, Mr. Kaplan and GridPoint entered into an Employment Agreement that was consistent with the terms and conditions they had agreed to on September 3, 2008.  Exhibit 22.

29.     Paragraph 1(a) of the Employment Agreement is titled "Position and Duties."  The first sentence of the paragraph provides that Mr. Kaplan "initially will serve" as General Manager of EVM.  The second sentence of Paragraph 1(a) of the Employment Agreement provides that Mr. Kaplan "shall render such business and professional services in the performance of his duties as General Manager, [EVM], consistent with the Employee's position within the Company, as shall reasonably be assigned to him by the Chief Executive Officer or his designee."  Exhibit 22.

30.     Paragraph 2 provides that the term of the Employment Agreement is three years from its effective date.  Paragraph 5(a) provides that if, during the term of the Employment Agreement, GridPoint terminates Mr. Kaplan's employment without cause or Mr. Kaplan terminates his employment for good reason, Mr. Kaplan would be entitled to a lump-sum payment of one year of salary.  The definition of "Cause" and "Good Reason" are set forth in a contemporaneously executed Stock Restriction Agreement; neither of these definitions is implicated in this case.  Exhibit 23.

31.     GridPoint's attorney, Jason Simon, transmitted the first draft of the Employment Agreement to Mr. Kaplan's attorney, Peter Cancelmo, on September 2, 2008.  The September 2, 2008 draft is identical to the final Employment Agreement except that Mr. Kaplan's position is not specified.  Exhibit 12.

32.     On September 9, 2008, Mr. Cancelmo transmitted to Mr. Simon revisions to the definition of "Cause" that Mr. Kaplan had proposed to strengthen the protections against termination for poor performance.  GridPoint accepted Mr. Kaplan's proposed modifications.  Exhibit 17.  Mr. Kaplan did not propose that a term be added to the agreement stating that GridPoint could not assign Mr. Kaplan to a position reporting to John Clark; nor did he request that the term "initially" be removed from Paragraph 1(a) of the Employment Agreement.

33.     On September 11, 2008, Mr. Simon transmitted to Mr. Cancelmo another draft of Mr. Kaplan's Employment Agreement.  This version is identical to the version signed by the parties on September 19.  Exhibit 18.  Nothing in the agreement prevents GridPoint from removing Mr. Kaplan as the General Manager of the EVM group once the "initial" period had expired.

34.     During the negotiations of the agreement, the parties never discussed the meaning of the term "initially" in Paragraph 1(a).

35.     On August 24, 2008, Mr. Lewis informed Mr. Kaplan that the business and technical operations of V2Green would be fully integrated into GridPoint within two years.  Both GridPoint and Mr. Kaplan understood prior to their execution of the

1  Employment Agreement that the position of General Manager of EVM would most likely

2  cease to exist before the expiration of the three-year term of the Employment Agreement.

3       36.    Mr. Kaplan testified that when he executed the Employment Agreement on

4  September 19, 2008, he understood that he would perform the job duties of General

5  Manager of EVM for as long as that position existed.  He further testified that if the

6  position of General Manager of EVM ceased to exist during the three-year term of the

7  Employment Agreement, GridPoint and he would have to mutually agree on an

8  alternative position for him within GridPoint.  Neither of these understandings is

9  memorialized in the Employment Agreement.

10       37.    Mr. Clark, Mr. Pollack, and Mr. Bridges also entered into employment

11  agreements with GridPoint on September 19, 2008.  Their agreements were identical in

12  form to Mr. Kaplan's with the exception of the designation of position and a vacation

13  provision unique to Mr. Pollack that Mr. Kaplan had negotiated for on Mr. Pollack's

14  behalf.  Exhibit A-4; Exhibit A-8; Exhibit A-9; Exhibit A-10.

15       38.    Mr. Clark, Mr. Bridges, and Mr. Pollack understood that the positions they

16  had been originally assigned to within GridPoint, as stated in their respective

17  employment agreements, were not positions for a set period of time.  They understood

18  that GridPoint could transfer them to other positions once the "initial" period had expired.

19       39.    Mr. Pollack held the position specified in his employment agreement until

20  EVM was completely integrated into GridPoint in July 2009.

21

22

1    40.    Mr. Bridges also held the position specified in his employment agreement

2    until July 2009.  Mr. Bridges voluntarily chose to change positions just prior to EVM's

3    complete integration into GridPoint in July 2009.

4    41.    Mr. Clark never held the position specified in his employment agreement.

5    At the time Mr. Clark entered into his agreement, both he and GridPoint specifically

6    understood that the position he would have after the acquisition closed, a minor role

7    assisting with transition work, would last approximately six months.  On September 16,

8    2008, however, Mr. Kaplan had proposed to Mr. Clark and Mr. Lewis that Mr. Clark's

9    position last only two to three months.  Exhibit 19; Exhibit 24; Exhibit A-6.

10    42.    On September 22, Michael Lach replaced Karl Lewis as GridPoint's COO.

11    Mr. Lewis assumed the title of Chief Strategy Officer.  Mr. Kaplan continued to report to

12    Mr. Lewis.  A few days later, Mr. Lewis removed Mr. Clark from Mr. Kaplan's team and

13    reassigned him to corporate development, another group within GridPoint.

14    43.    After the acquisition, Mr. Kaplan struggled to manage the EVM team and

15    was not succeeding at integrating the former V2Green unit into GridPoint.  GridPoint's

16    removal of Mr. Clark from the Seattle office before Mr. Clark completed his transitional

17    work hindered Mr. Kaplan's ability to succeed as the General Manager of EVM.

18    44.    On November 18, 2008, Mr. Pollack and Mr. Bridges raised concerns about

19    Mr. Kaplan's management of EVM during an in-person meeting with Mr. Lach and Mr.

20    Lewis in Arlington, Virginia.  They were concerned both that sales were slowing and that

21    there was a general breakdown in communication within the group.  Both Mr. Pollack

22

1 and Mr. Bridges expressed a preference for Mr. Clark as head of EVM instead of Mr.

2 Kaplan.

3     45.     The next day, Mr. Lewis informed Mr. Kaplan (and Mr. Pollack and Mr.

4 Bridges) that he and Mr. Lach were planning to replace Mr. Kaplan with Mr. Clark as

5 General Manager of EVM and have Mr. Kaplan focus on the automotive industry/OEM

6 role.  Mr. Kaplan asked Mr. Lewis and Mr. Lach to give him another chance as General

7 Manager of EVM.  Mr. Kaplan did not say that removing him as General Manager of

8 EVM would violate his Employment Agreement.

9     46.     On November 20, 2008, Mr. Lewis wrote Mr. Lach an e-mail setting forth

10 GridPoint's options for dealing with Mr. Kaplan.  One option Mr. Lewis proposed was

11 leaving Mr. Kaplan in charge of EVM.  Mr. Lewis said that if Mr. Kaplan did not

12 perform GridPoint would terminate him for cause and Mr. Kaplan would lose the stock

13 vesting schedule provided to him under the Stock Restriction Agreement.  Exhibit 28.

14     47.     Another option Mr. Lewis laid out in his November 20 e-mail to Mr. Lach

15 was putting Mr. Clark in charge of EVM.  Mr. Lewis stated that if that were done, some

16 other role would have to be found for Mr. Kaplan outside of EVM or else Mr. Kaplan

17 would leave GridPoint.  Mr. Lewis noted that if Mr. Kaplan quit, GridPoint would save

18 much of the cost associated with him.  Mr. Lewis was again specifically referring to the

19 GridPoint vesting schedule that was set out in Mr. Kaplan's Stock Restriction Agreement.

20 Exhibit 28.

21     48.     In this same e-mail, Mr. Lewis told Mr. Lach that the only downside he saw

22 for GridPoint from putting Mr. Clark in charge of EVM and precipitating Mr. Kaplan's

1  departure would be losing the excellent job Mr. Kaplan had done working with General

2  Motors.  Mr. Lewis noted that GridPoint did not yet have the ability to replace Mr.

3  Kaplan's value to GridPoint in that respect.  Mr. Lewis understood that losing Mr.

4  Kaplan meant losing GridPoint's relationship with General Motors.  Exhibit 28.

5       49.  After several days of discussion in November 2008 among Mr. Kaplan, Mr.

6  Lewis, Mr. Lach, Mr. Clark, Mr. Pollack, and Mr. Bridges, Mr. Lach and Mr. Lewis

7  agreed to Mr. Kaplan's proposal that he remain as General Manager of EVM reporting to

8  Mr. Lach instead of Mr. Lewis.  Mr. Lach had never worked with Mr. Kaplan and

9  believed that under new leadership, Mr. Kaplan might be able to succeed as head of

10  EVM.

11       50.  Over the next few months, Mr. Lach realized that Mr. Kaplan was not

12  capable of running EVM and that keeping him in that position would not be the best

13  option for GridPoint.  Mr. Lach also found Mr. Kaplan to be "high maintenance" in terms

14  of the number of projects he was unable to complete on his own given his executive

15  position within GridPoint.

16       51.  Mr. Lach received reports from other managers in other departments within

17  GridPoint that Mr. Kaplan was not attempting to integrate EVM into GridPoint but

18  appeared to be attempting to build out a separate unit for EVM.

19       52.  On January 16, 2009, Mr. Lach wrote an e-mail to Mr. Pollack and Mr.

20  Bridges asking how Mr. Kaplan had performed as General Manager of EVM since

21  November 2008.  Mr. Pollack responded that "things are much improved."  Mr. Bridges

22

1   also reported Mr. Kaplan had made progress with respect to the issues that had been

2   raised in November 2008.  Exhibit 29.

3        53.    On January 26, 2009, Mr. Kaplan wrote an e-mail to Mr. Corsell and Mr.

4   Lach to address what Mr. Kaplan understood to be an inequity between former V2Green

5   (Seattle) and other GridPoint (Arlington) employees regarding stock options.  Exhibit 31.

6        54.    Mr. Lach was upset by Mr. Kaplan's e-mail because he had told Mr.

7   Kaplan to sit down with GridPoint's Finance person and review any equity anomalies

8   involving EVM so that they could be addressed.  Mr. Kaplan chose instead to send what

9   Mr. Lach considered to be an inflammatory e-mail.  Even Mr. Kaplan agreed that he did

10  not handle the situation well.

11       55.    Mr. Lach responded to Mr. Kaplan's accusations in an exasperated tone

12  stating that he is "growing tired of this.  There isn't and never has been any Arlington vs

13  Seattle or us vs them plot going on . . . .  Here's another example of calories spun up for

14  absolutely no reason."  Exhibit 31.  Mr. Lach forwarded the e-mail to Mr. Corsell and

15  Mr. Lewis referring to Mr. Kaplan's e-mail regarding inequities as "horseshit" and

16  "completely misrepresentative of a long conversation he and I had two weeks ago." *Id.*

17  Mr. Lach also wrote "[Kaplan] is too high maintenance.  I'm going to really lay into him

18  when he calls.  I have to tell you I don't have the time nor the patience to babysit this

19  guy.  Too much to do and we have a great bench that is better than he is." *Id.*

20       56.    In the same e-mail, Mr. Lach asked Mr. Lewis about the "collateral

21  damage" that Mr. Lewis thought might exist if GridPoint parted ways with Mr. Kaplan

22  and put Mr. Clark back in charge of running EVM.  Exhibit 31.  By this time, Mr. Kaplan

1   had introduced Mr. Corsell, Mr. Lach, and Mr. Lewis to the General Motors executives

2   with whom he had been working for more than two years.

3       57.     Both Mr. Lewis and Mr. Corsell agreed with Mr. Lach's assessment of Mr.

4   Kaplan's performance.  Mr. Lewis noted that during negotiations for his Employment

5   Agreement, Mr. Kaplan would "constantly backtrack decisions, re-interpret meaning and

6   over analyze."  Exhibit 31.

7       58.     On January 27, 2009, Mr. Lach replied to Mr. Kaplan's equity incentives e-

8   mail of January 26, 2009.  As a result of receiving this e-mail Mr. Kaplan became

9   concerned that GridPoint was going to terminate his employment.

10      59.     Around this time, Mr. Lach contacted John Clark to inquire whether he

11  would be interested in taking over the leadership of EVM.  Mr. Clark agreed he would

12  assume the role as head of EVM.

13      60.     On January 27, Mr. Lach also met with his assistant, Karen Wirz, to discuss

14  putting together documentation "against" Mr. Kaplan to terminate his employment "with

15  cause."  Ms. Wirz took contemporaneous handwritten notes of the meeting with Mr.

16  Lach.  Exhibit 32.  GridPoint did not follow through with building a case to terminate Mr.

17  Kaplan with cause.

18      61.     In mid-February 2009, Mr. Corsell, Mr. Lach, and Mr. Lewis explored

19  whether there were any alternative positions within GridPoint that they were willing to

20  offer to Mr. Kaplan.  Mr. Corsell suggested in his e-mail that Mr. Kaplan might simply be

21  "delusional" and "grossly overestimating his [own] abilities."  Exhibit 34.

22

62.     On February 20, 2009, Ms. Wirz transmitted an e-mail to Mr. Kaplan informing him that Mr. Corsell and Mr. Lewis wanted to have dinner with him in Arlington on February 23, 2009.  Exhibit 35.

63.     On or about February 21, 2009, Mr. Lach and Mr. Corsell met to decide on their "game plan" for their upcoming meeting with Mr. Kaplan.  Mr. Corsell and Mr. Lach determined that they would first inform Mr. Kaplan they were replacing him as General Manager of EVM with Mr. Clark and that they wanted him to perform the automotive industry/OEM business development job reporting to Mr. Clark.  If, as they anticipated, Mr. Kaplan declined to report to Mr. Clark, they would then discuss alternatives with him.  Exhibit 36.

64.     At the beginning of the February 23rd meeting, Mr. Lach informed Mr. Kaplan that Mr. Clark would be replacing him as General Manger of EVM.  Mr. Lach told Mr. Kaplan that he wanted Mr. Kaplan to work with OEM/automotive industry and report to Mr. Clark.  Mr. Kaplan said that he would not take that position.  Mr. Kaplan reminded Mr. Corsell and Mr. Lach that during the acquisition negotiations he had repeatedly stated that he would not accept a role within GridPoint reporting to Mr. Clark. He then reiterated that he would not work for Mr. Clark under any circumstances.

65.     Mr. Kaplan attempted to open a discussion as to whether there were any alternative positions for him within GridPoint but, unbeknownst to Mr. Kaplan, by this point GridPoint had already decided against offering Mr. Kaplan any position other than the OEM role reporting to Mr. Clark.

66.     Also during the February 23rd meeting, Mr. Corsell said if Mr. Kaplan and GridPoint ended up "parting ways," Mr. Corsell wanted Mr. Kaplan's departure from GridPoint to be amicable.  Mr. Corsell proposed providing a separation package to Mr. Kaplan.  Mr. Corsell also said he would release Mr. Kaplan from his non-competition agreement and put Mr. Kaplan on the GridPoint Advisory Board.

67.     Mr. Kaplan's future role with GridPoint was not resolved at the February 23rd meeting.  The reason it was not resolved was based on Mr. Kaplan's unwillingness to accept the transfer of his role in EVM to working with OEMs and reporting to Mr. Clark.

68.     On the morning of February 24, 2009, Mr. Kaplan wrote an e-mail to Mr. Lach and Mr. Corsell outlining his view of the discussion of the night before and the possible options for moving forward.  The four potential options Mr. Kaplan laid out were: (1) he continues to lead EVM; (2) Mr. Clark leads EVM and Mr. Kaplan reports to Mr. Clark; (3) a new, mutually-agreeable role for Mr. Kaplan within GridPoint outside of EVM; or (4) Mr. Kaplan leaves GridPoint on mutually-acceptable terms.  Mr. Kaplan stated that he "can't be in a limbo state, where I am out of my current job without clear agreement on my new role (or exit terms)."  Exhibit 37.

69.     Mr. Kaplan took option 1 off the table because it was unacceptable to GridPoint.  He took option 2 off the table because it was unacceptable to him.  Mr. Kaplan stated his preferred outcome was option 3.

70.     Shortly after Mr. Kaplan sent his e-mail, Mr. Lach responded that he would meet with Mr. Kaplan later that day to discuss the potential of option 3 although Mr. Lach was not interested in other roles for Mr. Kaplan.  Exhibit 37.

71.     During their meeting later that day, Mr. Lach made it clear that his only interest was to remove Mr. Kaplan from his job as EVM General Manager and insert Mr. Clark.  Mr. Lach was not interested in the alternative proposals Mr. Kaplan offered in his February 24, 2009 e-mail.  Mr. Lach told Mr. Kaplan that they needed to move forward with announcing the change in EVM management and that he would not be held hostage by Mr. Kaplan's refusal to perform the role they asked him to perform.  Mr. Lach asked Mr. Kaplan for input on what he should include in his e-mail to the team about Mr. Kaplan's role at GridPoint.  Mr. Kaplan did not provide any input.

72.     At the conclusion of his meeting with Mr. Kaplan, Mr. Lach wrote Mr. Corsell and Mr. Lewis that GridPoint should "move to negotiate an exit."  Exhibit 38.

73.     One hour later, Ms. Wirz sent out an e-mail to GridPoint employees at Mr. Lach's direction stating that Mr. Lach had asked Mr. Clark to lead the EVM group.  The e-mail further stated that Mr. Kaplan's "ongoing role within the organization remains under discussion."  Exhibit 39.

74.     Mr. Kaplan did not state during the February 23rd meeting, in his e-mail on the 24th, or in his meeting with Mr. Lach on the 24th, that his Employment Agreement prohibited GridPoint from assigning him to another position within the company.

75.     There were no further discussions between GridPoint and Mr. Kaplan over an ongoing role for him within the organization outside of EVM.  There is no evidence

1   that GridPoint did anything after February 24th to find an alternative position for Mr.

2   Kaplan.  Mr. Kaplan left Mr. Corsell a message on February 24th to talk about where

3   things stood, but Mr. Corsell never returned the call.

4        76.    After Mr. Kaplan refused to accept a role reporting to Mr. Clark, Mr.

5   Corsell turned his focus to obtaining a separation package for Mr. Kaplan.  On February

6   25th, Mr. Corsell left a message for the head of the GridPoint Board of Directors'

7   Compensation Committee to obtain authorization to provide a separation package to Mr.

8   Kaplan.  Exhibit 48.

9        77.    On February 26, 2009, Mr. Lach wrote an e-mail to Mr. Corsell and Mr.

10   Clark stating that he "would not have [Mr. Kaplan] in the office past whatever transition

11   work is underway over the next week given the fact that he refused to work for John

12   [Clark] who is now running it.  This is something you'll have to make clear to him as you

13   work his exit.  We can't allow this dysfunction to remain.  Kaplan needs to be removed."

14   Exhibit 40.

15        78.    Mr. Lach's February 26th e-mail was his last communication to Mr. Corsell

16   about Mr. Kaplan before March 2, 2009.  By February 26th the only option GridPoint

17   was considering was a separation package for Mr. Kaplan.

18        79.    On Thursday, February 26, 2009, Mr. Corsell e-mailed Mr. Kaplan that he

19   would call him later that day to discuss "the road ahead."  Mr. Corsell did not call Mr.

20   Kaplan on Thursday or any of the following three days because he had not received a

21   response from the Compensation Committee about a separation package for Mr. Kaplan.

22

1    80.    Between February 25th and March 2nd, Mr. Kaplan worked to ensure a

2    smooth transition of management of the EVM group.

3    81.    On March 2, 2009, Mr. Kaplan's attorney transmitted a letter to Mr. Corsell

4    claiming that Mr. Kaplan had been terminated without cause within the meaning of his

5    Employment and Stock Restriction Agreements and did not currently have a position

6    within GridPoint.  Exhibit 43.

7    82.    After receiving the letter from Mr. Kaplan's attorney, Mr. Subit, Mr.

8    Corsell called Mr. Kaplan at home on March 2nd.  Mr. Corsell was angry and verbally

9    abusive.  Mr. Corsell insisted that Mr. Kaplan had not been terminated.  He admitted,

10   however, that Mr. Kaplan was "in limbo" with no defined role and that the only option

11   GridPoint was considering for Mr. Kaplan was a severance package.

12   83.    Mr. Corsell said he had been working with the Board of Directors'

13   Compensation Committee on a severance package for Mr. Kaplan.  Mr. Corsell said he

14   understood that Mr. Kaplan would not work for Mr. Clark, and GridPoint had respected

15   that.  Mr. Corsell demanded Mr. Kaplan retract his claim he had been terminated.  If Mr.

16   Kaplan did, Mr. Corsell said he would be willing to negotiate a separation package for

17   him.

18   84.    In response to Mr. Subit's letter of March 2nd, GridPoint took the position

19   that Mr. Kaplan had been appointed to the OEM business development position on

20   February 23rd.  This is unsupported by the record.  In Mr. Lach's February 24th e-mail

21   he stated to the "Team" that Mr. Kaplan's future status with GridPoint was unresolved;

22

1   not that he was being appointed to OEM business development position.  Exhibit 39.  Mr.

2   Kaplan refused to perform the position requested by GridPoint.

3       85.     On March 8, 2009, Mr. Kaplan reiterated that Mr. Corsell and Mr. Lewis

4   "clearly understood from our pre-merger discussions, reporting to John [Clark] was

5   always unacceptable to me."  In a lengthy March 14th response Mr. Corsell wrote that

6   when Mr. Kaplan sold V2Green to GridPoint he "lost the right to decide whether or not

7   [he] would work for John Clark, or whomever we thought appropriate to lead the EVM

8   group."  Exhibit 46.

9       86.     Mr. Kaplan's last day of work at GridPoint was March 5, 2009.

10      87.     In sum, the court finds that Mr. Kaplan was offered an alternative position

11  within GridPoint only after it became clear to GridPoint's management and other EVM

12  employees that Mr. Kaplan was not the right person to run EVM.  Mr. Kaplan refused to

13  perform the duties of the new position because he did not want to work for Mr. Clark.

14  GridPoint would not concede to Mr. Kaplan's demand to not work for Mr. Clark.  Mr.

15  Kaplan chose to leave his employment with GridPoint rather than have to work for Mr.

16  Clark.

## II.    CONCLUSIONS OF LAW

18      The issue in this case is whether GridPoint terminated Mr. Kaplan's employment

19  without "cause" within the meaning of his Employment Agreement or whether Mr.

20  Kaplan voluntarily resigned.  If the court finds that GridPoint terminated Mr. Kaplan

21  without cause then GridPoint's severance obligations to Mr. Kaplan under Paragraph 5(a)

22  of the Agreement apply.  By contrast, if the court finds Mr. Kaplan voluntarily left his

1   employment then GridPoint does not have any obligations to pay severance to Mr.

2   Kaplan pursuant to Paragraph 5(b) of the Agreement.

3          1.      Mr. Kaplan contends that GridPoint terminated his employment when it:

4   (1) removed him from his position as General Manager of EVM; and (2) required him to

5   report to Mr. Clark as his only option for remaining employed with GridPoint.  Mr.

6   Kaplan essentially claims that he was "constructively discharged" without cause and

7   GridPoint breached his Employment Agreement when it failed to pay severance.

8          2.      GridPoint contends that Mr. Kaplan voluntarily resigned without cause

9   within the meaning of Paragraph 5(b) of the Employment Agreement and is therefore not

10  entitled to any severance.

11         3.      As a threshold matter, the court must determine, based on Washington law,

12  whether Mr. Kaplan's decision to leave GridPoint was the result of GridPoint's

13  constructive discharge of his employment or of his own desire to leave the company

14  voluntarily.  The court must also determine whether GridPoint's decision to remove Mr.

15  Kaplan as General Manager of EVM was a breach of the Employment Agreement.  The

16  court addresses the latter issue first.

17         4.      In determining whether GridPoint breached the Employment Agreement by

18  removing Mr. Kaplan as General Manager of EVM, the court relies principally on the

19  meaning of the term "initially" as it is used in Paragraph 1(a) of the Employment

20  Agreement.

21         5.      The court's primary goal in interpreting a contract is to ascertain the

22  parties' intent. *Hearst Comm'n, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash.

1   2005); *see also Paradise Orchards Gen. P'ship v. Fearing*, 94 P.3d 372, 387 (Wash. Ct.

2   App. 2004).  The court looks to the parties' intent by focusing on the objective

3   manifestations of the agreement, rather than on the unexpressed subjective intent of the

4   parties.  *Hearst*, 115P.3d at 267 ("We do not interpret what was intended to be written

5   but what was written." (citations omitted)*.*)  "[W]hen interpreting contracts, the

6   subjective intent of the parties is generally irrelevant if the intent can be determined from

7   the actual words used." *Id.* (citations omitted).  The court must give the word "initially"

8   its ordinary, usual, and popular meaning unless the entirety of the agreement clearly

9   demonstrates a contrary intent.  *Id.*

10         6.     The evidence is undisputed that there were no discussions surrounding the

11   use of the word "initially" following Mr. Simon's circulation of the first draft of the

12   Employment Agreement to Mr. Kaplan's attorney on September 2, 2008.

13         7.     Mr. Kaplan claims the parties included the word "initially" in the

14   Employment Agreement because they understood the position of General Manager of

15   EVM would likely not exist for the entire three-year term of the Employment Agreement.

16   During negotiations, GridPoint and Mr. Kaplan had specifically discussed that EVM

17   would be fully integrated into GridPoint within one to two years of GridPoint's

18   acquisition of V2Green, at which point all the EVM managerial positions would most

19   likely disappear.  Under Mr. Kaplan's interpretation of the Employment Agreement,

20   "initially" in Paragraph 1(a) means until the completion of integration.  Support for this

21   interpretation, however, is not found in the evidence or testimony offered at trial relating

22

1    to the negotiation of the Employment Agreement nor does the Agreement support this

2    interpretation.

3        8.    GridPoint's position is that the word "initially" in the Employment

4    Agreement gives GridPoint the ability to remove Mr. Kaplan and the other V2Green

5    employees from their positions at any time.  Mr. Corsell concurred with this

6    interpretation.  He testified that Mr. Kaplan's Employment Agreement permitted the

7    company to remove Mr. Kaplan from his position as General Manager of EVM the day

8    after he became a GridPoint employee and that GridPoint could have made him a well-

9    paid janitor if it so chose.  The court finds GridPoint's interpretation unreasonable and

10   also not supported by the evidence at trial.

11       9.    The court, having found the parties' interpretation of the term "initially" to

12   be unreasonable, must give the term its own reasonable interpretation.  Taking into

13   account context of the full Employment Agreement, its subject matter and objective, and

14   the reasonableness of the respective interpretations advocated by the parties, the court

15   concludes the word "initially" means that GridPoint was required to keep Mr. Kaplan in

16   the position of General Manager of EVM for a reasonable period of time.

17       10.    The court finds that the five months that Mr. Kaplan held the position of

18   General Manager of EVM represented a reasonable period of time.  Accordingly,

19   removing Mr. Kaplan as General Manager of EVM after five months was not a breach of

20   the Employment Agreement.

21       11.    Next, the court must determine whether Mr. Kaplan's decision to leave

22   GridPoint was precipitated by GridPoint's creation of an intolerable working

ORDER- 23

1  environment or whether Mr. Kaplan left based on his own unwillingness to perform the

2  position GridPoint offered him.

3        12.    The court starts with the premise that under Washington law every contract

4  has an implied covenant of good faith and fair dealing that obligates the parties to

5  cooperate with one another so that each may obtain the full benefit of performance.

6  *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 700 P.2d 338, 339 (Wash. Ct. App.

7  1985) (citing *Lonsdale v. Chesterfield*, 662 P.2d 385, 387 (Wash. 1983) (additional

8  citations omitted).)  Thus, if GridPoint effectively discharged Mr. Kaplan by creating an

9  intolerable work environment knowing Mr. Kaplan would quit, it may be required to pay

10  him severance pursuant to the Employment Agreement even though it did not technically

11  terminate his employment.  This is based on the premise that if Mr. Kaplan's failure to

12  adhere to the terms of his Employment Agreement (*i.e.*, his failure to remain employed

13  throughout the employment period) was the fault GridPoint, then GridPoint is not legally

14  excused from its own performance obligations (*i.e.*, paying Mr. Kaplan severance upon

15  his resignation).

16        13.    On the other hand, if Mr. Kaplan voluntarily resigned or abandoned his

17  employment because of a "desire motivated by a dissatisfaction with working

18  conditions," GridPoint would not be required to pay him severance.  *Barrett*, 700 P.2d at

19  343.

20        14.    In determining whether GridPoint violated the implied covenant of good

21  faith and fair dealing by forcing Mr. Kaplan to quit, the court may look to the

22  constructive discharge framework for guidance.  Constructive discharge occurs where an

1   employer deliberately makes an employee's working conditions intolerable and thereby

2   forces him to quit his job.  *Id.* at 339 (quotations omitted).  The court looks to the

3   employer's words or acts to determine if there is an intention to dispense with the

4   employee's services.  *Id.* at 342.  Thus, as applied in this case, the court must determine

5   whether GridPoint intentionally precipitated a resignation, though formally retaining Mr.

6   Kaplan, in an attempt to avoid liability for compensation under the severance plan.  The

7   court concludes that it did not.

8       15.    To establish constructive discharge, Mr. Kaplan must show: (1) a deliberate

9   act by the employer that made his working conditions so intolerable that a reasonable

10  person would have felt compelled to resign; and (2) that he resigned because of the

11  conditions and not for some other reason.  *Washington v. Boeing Co.*, 19 P.3d 1041, 1049

12  (Wash. 2000).  Whether conditions are intolerable is a question of fact.  *Id.* (citations

13  omitted).  The inquiry is whether "working conditions would have been so difficult or

14  unpleasant that a reasonable person in the employee's shoes would have felt compelled to

15  resign."  *Id.* (quotations omitted).  The "intolerable" element can be shown by aggravated

16  circumstances or a continuous pattern of discriminatory treatment.  *Id.*  A resignation is

17  presumed to be voluntary, and the employee must introduce evidence to rebut that

18  presumption.  *Id.*

19      16.    Mr. Kaplan grounds his argument that he was constructively discharged by

20  GridPoint in the fact that in February 2009 GridPoint offered Mr. Kaplan the OEM

21  business development position reporting to Mr. Clark as his only option for remaining

22  with the company knowing and intending that this would precipitate his departure.

17.     Mr. Kaplan also argues, as he must, that a reasonable employee in Mr. Kaplan's shoes in February 2009 would have not have agreed to report to Mr. Clark given their acrimonious work history.

18.     Under Washington law, Mr. Kaplan's resignation is presumed voluntary unless he is able to put forth evidence to rebut the presumption.  The court finds that he has not met his burden.  After listening to Mr. Kaplan's testimony regarding the few occasions that Mr. Clark behaved as a "bully" toward Mr. Kaplan, the court is not persuaded that a reasonable person having to report to Mr. Clark would find it so intolerable that they would feel compelled to resign.  The court further finds that Mr. Kaplan's sensitivities are not consistent with those of the reasonable person.  A personality conflict, without more, does not create an intolerable working condition.

19.     Mr. Kaplan's intolerance of Mr. Clark's management style and Mr. Clark's impatience with Mr. Kaplan was colorfully summed up by Mr. Lewis when, during the negotiations for GridPoint's acquisition of V2Green, Mr. Lewis asked his assistant to do some reconnaissance to determine whether "Dave [Kaplan] is the psychopath that John [Clark] says he is or whether John is the power-freak that Dave says he is.  It may be both . . . ."  Exhibit 21.  Although it is clear that the two men did not like working together and that Mr. Kaplan would much prefer being Mr. Clark's boss than reporting to Mr. Clark, this personal conflict does not rise to the level of an intolerable working condition.

20.     The court therefore finds that Mr. Kaplan was not constructively discharged and that he is not entitled to severance under Paragraph 5(a) of the Employment

1    Agreement.  Nor is Mr. Kaplan entitled to "wages due" pursuant to RCW 49.48.010

2    because the court does not find that GridPoint owes Mr. Kaplan back wages.

3        21.    The court finds in favor of GridPoint in this matter.  The clerk shall enter

4    judgment accordingly.

5        Dated this 9th day of June, 2010.

6

7

8    _____

9    JAMES L. ROBART
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 27